NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

SARA K., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, N.K., *Appellees*.

No. 1 CA-JV 18-0465
FILED 6-20-2019

Appeal from the Juvenile Court in Maricopa County
No.  JD27706
The Honorable M. Scott McCoy, Judge

**AFFIRMED**

COUNSEL

Robert D. Rosanelli Attorney at Law, Phoenix
By Robert D. Rosanelli
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Sandra L. Nahigian
*Counsel for Appellee, Department of Child Safety*

---

## MEMORANDUM DECISION

Presiding Judge Michael J. Brown delivered the decision of the Court, in which Judge Jon W. Thompson and Judge Kenton D. Jones joined.

---

**B R O W N**, Judge:

¶1        Sara K. ("Mother") appeals from the juvenile court's order terminating her parental rights to her daughter, N.K., born in 2016 ("the child").[1]  The only issue before us is whether the court's diligent efforts finding is supported by reasonable evidence.  For the following reasons, we affirm.

### BACKGROUND

¶2        About one month after the child was born, the Department of Child Safety ("DCS") dispatched an investigator to Mother's home.  The investigator observed various loose items cluttering the floor, dirt covering the walls, and several unknown adults—reportedly homeless individuals—who the family had allowed inside to do laundry.  DCS removed the child from the home, and she was placed with a licensed foster family.

¶3        In January 2017, Mother participated in a psychological evaluation with Dr. James Holmes, who ultimately diagnosed her with "Intellectual Disability, Mild."  Holmes opined that Mother was unlikely to demonstrate adequate independent parenting skills in the foreseeable future because "deficits related to her intellectual disability, which have persisted throughout her life, have impacted her parenting skills and abilities and will likely remain stable and continue for a prolonged, indeterminate period of time."  But Holmes's prognosis was not altogether negative, suggesting that Mother could benefit from continued counseling, especially with a doctoral level clinician, and that DCS could consider referring Mother for services through the Division of Developmental Disabilities ("DDD").

---

[1]      The juvenile court also terminated the parental rights of the child's father, J.M., ("Father").  He is not a party to this appeal.

**¶4**        After the juvenile court found the child dependent as to Mother, DCS moved to terminate Mother's parental rights, alleging (1) she could not discharge parental responsibilities because of a mental deficiency that will continue for a prolonged indeterminate period and (2) the child had been in an out-of-home placement for more than 15 months, Mother had not remedied the circumstances causing the placement, and her mental deficiency and sporadic participation in services made it unlikely that she could properly parent in the near future.  Ariz. Rev. Stat. § 8-533(B)(3), (B)(8)(c). The juvenile court held a hearing, receiving testimony from Holmes, Mother, and DCS case manager David Tilley.  The court terminated Mother's rights on both grounds alleged and this timely appeal followed.

## DISCUSSION

**¶5**        Before terminating a parent-child relationship, the juvenile court must first find at least one statutory ground by clear and convincing evidence.  *Christina G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 231, 234, ¶ 12 (App. 2011).  As a necessary element to overcome a parent's fundamental right to custody of his or her child, the court must also find that DCS made diligent efforts to provide appropriate reunification services before it can terminate parental rights under either § 8-533(B)(3) or (B)(8)(c). *See Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 32 (App. 1999).  DCS need not provide services that would be futile, nor ensure parents participate in the services offered, but DCS must at least provide "the parent[s] 'with the time and opportunity to participate in programs designed to help [them] to become an effective parent.'"  *Christina G.*, 227 Ariz. at 235, ¶¶ 14, 15 (citation omitted).  DCS does not provide that opportunity, however, "when it neglects to offer the very services that its consulting expert recommends."  *Mary Ellen C.*, 193 Ariz. at 192, ¶¶ 34, 37.  Because we do not weigh the evidence on appeal, "[w]e accept the . . . court's findings of fact unless no reasonable evidence supports them."  *Christina G.*, 227 Ariz. at 234, ¶ 13.

**¶6**        Mother argues that reasonable evidence does not support the court's finding that DCS made reasonable reunification efforts.  To address this issue, we start by recognizing that Mother has had extensive involvement with DCS prior to this case.  In August 2015, the juvenile court terminated her parental rights to her older child (born in 2013) under the same grounds alleged here.  In that proceeding, DCS established it had provided Mother with various services, including parent-aide services, case-aide services, a bonding and best interests assessment, and transportation.  Although DCS offered these services, Mother failed to

consistently engage with them and "was unable to make significant behavioral changes that would indicate that she is able to safely parent any young child." At the time, DCS also provided Mother with a psychological evaluation from Dr. Daniel Juliano, who opined that her condition was "not really a mental health issue," but rather "a cognitive disorder of significance" that mental health services could not properly address. Although Juliano ultimately did not recommend any specific services, DCS referred Mother to DDD services but they were closed out unsuccessfully due to her lack of participation.

¶7          As to this termination proceeding, DCS began providing Mother with services in November 2016, soon after removing the child from her home, with joint supervised visits for Mother and Father. Next came Dr. Holmes's January 2017 evaluation, suggesting Mother would benefit from continued counseling, particularly from a doctoral level clinician, and DDD services. Through February, case aides overseeing Father's and Mother's joint visits reported "no concerns" about their ability to parent, and the two began parent-aide services in March. Nevertheless, as early as April, DCS expressed concerns about the prospects for Mother's future participation, given that (1) she had already missed visits when Father was absent; (2) Father had disclosed his intent to end their relationship; and (3) Mother was unlikely to be able to parent independently.

¶8          While parent-aide services were ongoing, in May, Tilley consulted with "unit psychologist Dr. Hunt" who recommended that Mother participate "in psychological counseling to help her understand her disability and her limitations." Acting on Hunt's recommendation, DCS referred her for individual counseling. Mother did not begin counseling at Applied Behavioral Interventions ("ABI") until October 2017, however, because DCS was searching for a therapist commensurate with Holmes's recommendations.

¶9          By the time ABI began providing Mother with counseling, her personal situation had changed. As of June 2017, she no longer lived with Father. The two had "not let their tumultuous relationship hinder their desire to care for" the child, though, and they resumed supervised visitation in October as well. At this point, visits went well for the most part, although Mother once ignored the child after she and Father got into an argument before arriving.

¶10         Near the end of 2017, Mother's engagement with the services DCS offered her started to decline. In December, Mother began frequently cancelling supervised visitation without offering any make-up dates. This

trend continued into the new year—Mother completed only a handful of visits in January 2018, with Father attending just one. After that, Father "began refusing visits" and "requested to relinquish his rights," a concerning development given Mother's tendency to not visit the child without him. Mother last visited the child with a case aide present on February 6 and would eventually be closed out of visitation services in June.[2] Also in January, ABI "severed its contact with [DCS] and [Mother's] counseling ended" until DCS could locate a new counseling service for her.

¶11 It was not until April, after the juvenile court had ordered the case plan changed to severance and adoption, that DCS referred Mother for individual counseling again, a delay it attributes to ABI's refusal to turn over Mother's medical records. When she was finally assigned to Desert Edge Mentoring Services ("Desert Edge"), Mother did not engage with their services. Before completing her intake on May 16, she cancelled her first two appointments and did not attend a third. Once she completed her intake, Mother called in to cancel all counseling sessions and Desert Edge eventually discharged her for nonattendance at the end of June.

¶12 Around this time, Tilley also assisted Mother in applying for DDD services. DDD determined she was eligible in May and conducted an initial planning team meeting in June. At the termination hearing conducted in August and October 2018, Mother's progress with DDD remained unknown.

¶13 Despite the foregoing, Mother argues DCS denied her appropriate reunification services by failing to abide by Holmes's recommendation that she be provided therapeutic visits from a psychologist and to ensure the counseling she did receive went on uninterrupted. The evidence is to the contrary. Holmes testified at the hearing that, as far as improving her ability to parent, the services offered through ABI and Desert Edge would assist Mother in a similar way as those he first recommended. And though there was a nine-month delay before counseling began, Tilley attributed the delay to DCS's search for a properly credentialed therapist who could offer Mother the type of service Holmes recommended. Put another way, although it might be that DCS could have provided some form of counseling sooner, it is also likely that such counseling would have fallen short of Holmes's recommendations. It is true that the second counseling referral was also delayed, but the reason for this delay was ABI's failure to turn over medical records—which would

---

[2] Mother privately arranged two visits with the child's placement in 2018.

have been necessary for subsequent counseling. In the end, once Mother was assigned to Desert Edge, she called ahead to cancel all but one session with them.

¶14        Mother also argues that DCS failed to ensure that she ultimately received the DDD services that Holmes suggested. Tilley testified that in letters and conversations he consistently informed Mother of the services she should pursue. Mother also acknowledges that Tilley assisted her in applying for DDD services in April and that she had a DDD consultation in June. At its core, then, Mother's argument is that after DCS provided her with the time and opportunity to participate in DDD services, it was required to go a step further and ensure she participated in those services. But DCS "is not required to . . . ensure that a parent participates in each service it offers." *Maricopa Cty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994). Significantly, Mother—who was discharged from DDD in 2015 for nonparticipation in the first termination—had largely stopped participating in the other services DCS offered her by the time of the second termination hearing. After providing her with various services for nearly two years, including helping her obtain DDD services, the decision not to wait even longer to see whether Mother would fail to participate in DDD services once again does not render DCS's efforts unreasonable.

¶15        Based on the record before us, we cannot say that no reasonable evidence supports the juvenile court's finding that DCS made reasonable efforts to provide Mother with reunification services.

## CONCLUSION

¶16        The juvenile court's order terminating Mother's parental rights is affirmed.



AMY M. WOOD • Clerk of the Court
FILED:  AA