NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

JEANNA T.,
*Appellant,*

v.

DEPARTMENT OF CHILD SAFETY, A.I.,
*Appellees.*

No. 1 CA-JV 20-0380
FILED 5-4-2021

Appeal from the Superior Court in Maricopa County
No. JD36423
The Honorable Sara J. Agne, Judge

**AFFIRMED**

COUNSEL

Denise L. Carroll Esq., Scottsdale
By Denise L. Carroll
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Sandra L. Nahigian
*Counsel for Appellee*

---

## MEMORANDUM DECISION

Judge James B. Morse Jr. delivered the decision of the Court, in which Presiding Judge D. Steven Williams and Judge Jennifer B. Campbell joined.

---

**M O R S E**, Judge:

¶1        Jeanna T. ("Mother") appeals from an order terminating her parental rights.  For the following reasons, we affirm.

### FACTS AND PROCEDURAL BACKGROUND

¶2        Mother's child ("the Child") was born in 2006.  In September 2018, the Arizona Department of Child Safety ("DCS") received a report that the Child had threatened Mother with a knife.  DCS also received reports that the Child experienced mental breakdowns, put duct tape over her own mouth, and punched herself in the face.  Mother contacted the police, who took the Child to the hospital.  The Child had been hospitalized four times in the previous six weeks.  Concerned for her own personal safety, Mother asked DCS to take temporary custody of the Child.  When the Child was discharged from the hospital, DCS placed the Child in foster care.

¶3        In October 2018, DCS filed a dependency petition alleging the Child was dependent due to Mother's neglect.[1]  The juvenile court found the Child dependent and set a case plan of family reunification.

¶4        In December 2018, DCS reported that the Child was showing "no aggression or other maladaptive behaviors in the foster home," was exhibiting "very minimal behavioral issues," and twice had her behavioral-health medication decreased.  Despite the Child's extensive medical history, which included "vasal vagal syncope, a heart condition . . . , anemia, sleep apnea, migraines, and day and night encopresis/enuresis," DCS reported that "the only current apparent medical condition is the daily encopresis and enuresis."

---

[1]        The petition also alleged the Child was dependent due to her father's abuse and neglect.  The juvenile court terminated the parental rights of the Child's father in November 2020.

¶5        DCS referred Mother to Dr. Daniel Juliano for a psychological evaluation in January 2019.  While noting that Mother exhibited excellent reading comprehension skills and showed no signs of any cognitive functioning issues, Dr. Juliano found Mother's clinical profile suggested "a person with prominent hostility and suspiciousness."  He noted that Mother exhibited "an unusual level of concern about physical functioning" and "had very overvalued beliefs about conspiracies . . . ."  Mother informed Dr. Juliano that her own mother had been trying to kill her since she was a baby, that the Child's father and the Mexican cartel were trying to kill her, and that she had to move around the country and obtain orders of protection to maintain safety.[2]  Dr. Juliano recorded diagnostic impressions of general anxiety disorder with panic attacks, PTSD, "Prominent Borderline Features," and "Cannabis use, Marijuana card."  He recommended that Mother undergo a psychiatric evaluation, trauma therapy, and eye movement desensitization and reprocessing ("EDMR").

¶6        Mother subsequently self-referred to La Frontera, an outpatient mental-health treatment center.  She indicated interest in EDMR during her March 2019 intake but was hesitant to pursue the treatment.  A La Frontera nurse practitioner prescribed Mother a new anxiety medication following a psychiatric evaluation in April.

¶7        Mother left Arizona in May 2019.  She was unsuccessfully closed out of her first parent-aide referral in June after failing "to successfully complete the enhancements to protective capacities as described on the parenting plan."  DCS noted that Mother attended twenty-three of twenty-five visits but only four of twelve skill sessions.  DCS again referred her for parent-aide services.

¶8        By August 2019, Mother had not engaged in counseling services.  Mother said she could not commit to individual counseling due to a change in her work schedule, and she gave permission for La Frontera to downgrade her level of care from counseling services to "medication management only."  The following month, Mother told the Case Manager "that the most recent group of counselors had told her that after adjusting her meds that she is stable and does not need to do further treatment."

_____

[2]        Mother repeated these beliefs while testifying at the severance hearing and acknowledged having orders of protection against her mother, sister, boyfriend, and the Child's father.

Mother told the Case Manager that doctors had taken her off anxiety medication after being diagnosed with a brain aneurism in October 2019.

¶9            That same month, Mother accused DCS of neglecting the Child's medical conditions. She produced letters purporting to be from practitioners at Phoenix Children's Hospital ("PCH") stating that the Child had been diagnosed with multiple conditions and prescribed various medication, medical equipment, and dietary recommendations. PCH staff later stated that the letters were falsified. Testing indicated the Child had none of the food allergies Mother had claimed.

¶10          In November 2019, the juvenile court ordered DCS to refer Mother for EDMR and trauma therapy, as per Dr. Juliano's initial recommendations. Mother informed her counselor at La Frontera that "she was told she had to do EDMR by DCS," but that doctors had advised her against EDMR because of potential health concerns. The La Frontera counselor responded that it was "inappropriate for the judge to require EMDR as it is intense and requires a client to be emotionally ready." The counselor noted that Mother was not ready for EMDR and would first need to develop skills to decrease her anxiety.

¶11          Mother expressed a desire to begin individual therapy in December 2019 but did not want to engage in anything that was "too triggering or trauma therapy." She was unsuccessfully closed out of her second parent-aide referral later that month for failing to fully engage in parent-aide services.

¶12          DCS filed a motion to terminate Mother's parental rights in January 2020 on grounds of Mother's mental illness and the Child's fifteen months' time in foster care. The juvenile court changed the case plan to severance and adoption.

¶13          DCS contacted a forensic child welfare consultant in February 2020 to review documents and evaluate whether Mother had committed medical child abuse. The consultant identified "concerns that [Mother] has falsified or exaggerated medical concerns for her daughter," and noted that "since the separation from [Mother], other caregivers have not observed the severe mental and physical health conditions [Mother] was reporting for [the Child]."

¶14          DCS also consulted with a psychologist to discuss potential services for Mother and the Child. The psychologist expressed that EDMR and trauma therapy "would not likely be helpful" because Mother's "sensory input is distorted and her beliefs are frequently questionable."

Accordingly, in March 2020, DCS moved the court to reconsider its November 2019 order directing DCS to refer Mother for EDMR and trauma therapy and postpone that therapy "until [M]other's therapy team recommends she is ready to engage in those services." The juvenile court granted the motion and vacated the order.

¶15 La Frontera discharged Mother in March 2020, noting she had failed to engage in treatment following her intake, psychiatric evaluation, and medication check. DCS subsequently referred Mother to Desert Edge Mentoring for no-cost therapy, but Mother indicated she would instead wait until she could obtain insurance and then self-refer for treatment. Mother attempted to return to La Frontera after obtaining insurance in April or May, but La Frontera would not take her insurance. Mother scheduled a June appointment at Redemption Psychiatry but failed to keep the appointment.[3]

¶16 DCS reported in April 2020 that the Child was off all behavioral-health medications, had met her behavioral-health goals, showed no aggressive or maladaptive behaviors, and had graduated from case-management and individual-therapy programs. The Child indicated that she wanted to remain in her placement for middle and high school. Mother participated in therapeutic visits with the Child in April, May, and June before requesting virtual visits due to COVID-19. Mother failed to set up the virtual visits, but testified that DCS failed to provide the necessary contact information and did not respond to her emails requesting the information. In September, DCS noted the Child had "reported to multiple individuals" that she wanted severance to happen as soon as possible.

¶17 The juvenile court held a severance hearing in September 2020. Dr. Juliano testified that Mother's "feelings of despair, [being] overwhelmed, fear, suspiciousness, having to get restraining orders to protect herself . . . would be very troubling for a child and for [Mother] to be under that kind of onslaught with no relief." He opined that Mother's failure to follow through with mental-health treatment "would place [the Child] at risk for the kind of experiences she had prior to coming in care, where [Mother] actually felt endangered by her daughter trying to murder her." However, Dr. Juliano also testified that Mother "did not have conspiratorial beliefs about her daughter," and opined that "if [the Child] had some of these behavioral excesses that [Mother] reported, it was because of [the Child's] untreated mental health as opposed to" Mother's

---

[3] Mother testified that she was unable to keep the appointment because in-person services had been cancelled.

conspiratorial thinking. Dr. Juliano testified that EDMR would be crucial treatment for Mother "if she was stabilized psychiatrically."

¶18 The Case Manager testified that DCS did not refer Mother for EDMR or trauma therapy as ordered by the court because Mother claimed her health precluded such treatment and because DCS is unable to require therapists to provide specific treatments. The Case Manager also opined that severance and adoption was in the Child's best interests because it would provide the Child with a sense of safety and the opportunity to form family relationships in a long-term, stable environment. Acknowledging the Child's current placement was unwilling to adopt, the Case Manager testified the Child was adoptable, a potential adoptive placement had been identified, and the process for that placement had been initiated. The Case Manager expressed concern that, if the Child were reunited with Mother, the Child would be forced to take medication for conditions she did not actually have and would live in constant fear that family members and the Mexican cartel would be trying to kill her.

¶19 Mother testified that she was employed, living with her sister-in-law, planning to move into an apartment of her own in October 2020, and willing to participate in any DCS-referred service. She said the Child had been prompted by her foster mom and the Case Manager to express a desire for severance. She denied falsifying letters from PCH.

¶20 The juvenile court terminated Mother's parental rights in November 2020 on the ground of mental illness. While acknowledging that DCS "did not attempt to refer Mother for EDMR therapy, as ordered by the Court on Dr. Juliano's recommendation," the court found the evidence "showed reasonable grounds to believe that Mother was not stable enough for the same." The court found that DCS "made reasonable efforts to assist in reunifying the family" and that severance was in the Child's best interests because it would make her legally available for adoption, a prospective adoptive placement had been identified, and she would be able to remain in her current placement until the time of her adoption.

¶21 Mother timely appealed. We have jurisdiction under A.R.S. §§ 8-235, 12-120.21(A)(1), and -2101(A)(1).

## DISCUSSION

¶22 Parental rights are fundamental but not absolute. *Dominique M. v. Dep't of Child Safety*, 240 Ariz. 96, 97, ¶ 7 (App. 2016). A court may terminate a parent's right in the care, custody, and management of their children "if it finds clear and convincing evidence of one of the statutory

grounds for severance, and also finds by a preponderance of the evidence that severance is in the best interests of the children." *Id.* at 98, ¶ 7.

### A. Standard of Review.

**¶23** The juvenile court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts." *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4 (App. 2004). We will not reweigh evidence or reevaluate witness credibility. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 151, ¶ 18 (2018). We view the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to affirming the juvenile court's order and will affirm unless "reasonable evidence does not support its factual findings." *Ariz. Dep't of Econ. Sec. v. Matthew L.*, 223 Ariz. 547, 549, ¶ 7 (App. 2010).

### B. Reasonable Reunification Effort.

**¶24** Mother does not dispute that she suffers from severe mental illnesses which are "likely to continue for a prolonged, indeterminate period" and which render her unable to discharge parental responsibilities. She claims, however, that DCS failed to make a reasonable effort to provide appropriate reunification services aimed at improving her mental health.

**¶25** Before terminating parental rights under A.R.S. § 8-533(B)(3), the State must prove by clear and convincing evidence that it "made a reasonable effort to provide [the parent] with rehabilitative services or that such an effort would be futile." *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 193, ¶ 42 (App. 1999). Citing *Mary Ellen C.*, Mother argues that DCS failed to make reasonable reunification efforts by neglecting to refer her for EDMR and trauma therapy per Dr. Juliano's initial treatment recommendations. *See id.* at 192, ¶ 37 (noting the State fails to make reasonable efforts to rehabilitate a parent "when it neglects to offer the very services that its consulting expert recommends"). Mother argues the juvenile court erred by excusing DCS's noncompliance with its November 2019 order to provide such therapy before the order was vacated in March 2020.

**¶26** There is evidence in the record to support the juvenile court's ruling that DCS made reasonable efforts to reunify Mother and the Child. Unlike the "belated, fitful, and indifferent" reunification efforts in *Mary Ellen C.*, *id.* at 193, ¶ 38, DCS provided Mother with extensive parent-aid services, including case management, transportation services, psychological and psychiatric evaluations, a referral for no-cost individual therapy, child visitation, two parent aides, and therapeutic visits.

¶27        Although DCS did not refer Mother for EDMR or trauma therapy, evidence supports the juvenile court's determination that there were "reasonable grounds to believe that Mother was not stable enough for the same." After voluntarily leaving Arizona for a month, Mother claimed counselors told her she no longer needed treatment. She later claimed a brain aneurism precluded her from engaging in therapy or taking anxiety medication. A counselor told Mother it was inappropriate for the court to order EDMR because Mother was not emotionally ready. Another psychologist opined that EDMR was unlikely to be helpful to Mother.

¶28        Mother consistently indicated that she was either unwilling or physically unable to engage in mental-health treatment. She failed to participate in counseling services at La Frontera for a full year following her initial intake. She stopped taking her anxiety medication and, although she attributed this decision to doctors' recommendations based on her brain aneurism, the juvenile court found Mother's "reports of physical illness" were "not entirely credible" in light of her falsification of medical documents and false representation of the Child's medical needs. Mother rejected DCS's referral to Desert Edge Mentoring for no-cost counseling, did not keep her June appointment at Redemption Psychiatry, and failed to reschedule a new appointment prior to testifying at the severance hearing.[4]

¶29        Mother argues that DCS failed to show that providing her EDMR would be futile. But DCS was only required to prove either that it made reasonable reunification efforts *or* that such efforts would be futile. *See id.* at ¶ 42. Because evidence supports that DCS made reasonable efforts at reunification, we uphold the juvenile court's judgment.

### C.        Best Interests.

¶30        The State must also prove "by a preponderance of the evidence that severance is in the child's best interests." *Alma S.*, 245 Ariz. at 150, ¶ 8. Severance is in a child's best interests if either: "(1) the child will benefit from severance; or (2) the child will be harmed if severance is denied." *Id.* at 150, ¶ 13. "[W]e can presume that the interests of the parent and child diverge [where] the court has already found the existence of one of the statutory grounds for termination by clear and convincing evidence." *Kent K. v. Bobby M.*, 210 Ariz. 279, 286, ¶ 35 (2005); *see also Maricopa Cnty. Juv. Action No. JS-6831*, 155 Ariz. 556, 559 (App. 1988) ("In most cases, the

---

[4]        Mother testified that Redemption Psychiatry resumed in-person services in August and that she had an appointment scheduled for October.

presence of a statutory ground will have a negative effect on the children."). Our focus shifts to the child's interests, and we must balance the parent's "diluted" interest "against the independent and often adverse interests of the child in a safe and stable home life." *Kent K.*, 210 Ariz. at 286, ¶ 35. "The 'child's interest in stability and security' must be the court's primary concern." *Alma S.*, 245 Ariz. at 150, ¶ 12 (quoting *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 4, ¶ 15 (2016)).

¶31 Mother argues that DCS failed to establish that the Child would either receive a benefit from severance or suffer a detriment from denying severance. She further asserts that, because "there is no immediate adoptive family identified, it is in [the Child's] best interest" to allow Mother more time to address her mental-health issues through appropriate services, whereupon "resumption of a normal family relationship may be possible."

¶32 We reject this argument. The juvenile court noted that "[w]hen Mother and [the Child] would visit, [the Child] would regress afterward or in nervous anticipation of the contact—experiencing enuresis—and the [DCS] Specialist credibly testified that [the Child] would take on the parental role at the few and far between visits with Mother that did occur." Furthermore, Dr. Juliano testified that reunification under these circumstances would be an overwhelming experience for a child, and the Case Manager expressed concern that Mother would force the Child to take unnecessary medication.

¶33 Moreover, the court found the Child favored severance, could remain in her current placement until the time of her adoption, and a family had been identified as a prospective adoptive placement. Because these findings are supported by reasonable evidence, the juvenile court did not err in finding severance was in the Child's best interests. *See Demetrius L.*, 239 Ariz. at 4, ¶ 12 ("When a current placement meets the child's needs and the child's prospective adoption is otherwise legally possible and likely, a juvenile court may find that termination of parental rights, so as to permit adoption, is in the child's best interests.").

**CONCLUSION**

¶34     We affirm the juvenile court's order.



AMY M. WOOD • Clerk of the Court
FILED:     AA