NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

KAYN C., *Appellant,*

*v.*

DEPARTMENT OF CHILD SAFETY, K.C., *Appellees.*

No. 1 CA-JV 21-0338
FILED 4-28-2022

Appeal from the Superior Court in Maricopa County
No. JD533842
The Honorable Jeffrey Rueter, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Emily M. Stokes
*Counsel for Appellee*

Maricopa County Public Advocate, Mesa
By Suzanne W. Sanchez
*Counsel for Appellant*

_____

**MEMORANDUM DECISION**

Judge Peter B. Swann delivered the decision of the court, in which Presiding Judge Cynthia J. Bailey and Judge D. Steven Williams joined.

_____

**S W A N N**, Judge:

¶1 This is an appeal from an order establishing a permanent guardianship of a dependent child under A.R.S. § 8-871. We affirm because sufficient evidence supports the order.

**FACTS AND PROCEDURAL HISTORY**

¶2 K.C. was born in 2013 to Juanita D. ("Mother") and Kayn C. ("Father"). The record is silent regarding K.C.'s earliest years. But throughout 2018 and 2019, she lived exclusively with Mother and her maternal grandmother ("Grandmother"), with Grandmother helping to raise K.C. because Mother was ill. Father did not act as a caregiver to K.C. during this time.

¶3 K.C. began living with Father at some point after Mother died in December 2019. In October 2020, Father sent K.C. to Grandmother's house for a weekend. At the end of the weekend, Father told Grandmother that the police were looking for him. He asked Grandmother to keep K.C. but not enroll her in school or take her to any medical providers until he reached out.

¶4 Father was arrested the next day. He was charged for multiple domestic-violence crimes against his wife based on allegations that during K.C.'s weekend with Grandmother, Father locked his wife in a room, urinated on her, and obstructed her breathing. In December 2020, he pled guilty to one count of aggravated assault, as well as one count of aggravated DUI arising from a December 2017 incident. He was sentenced to prison terms scheduled to end in April 2022.

¶5 Meanwhile, K.C. continued to reside with Grandmother. Grandmother sought appointment as K.C.'s legal guardian, but Father refused. Grandmother nonetheless obtained medical care for K.C. in November 2020 and enrolled her in school in December. She also instituted a dependency action in December, and the Department of Child Safety ("DCS") became involved. Grandmother reported to a social worker that

though K.C. grieved the loss of Mother, she did not ask for Father. K.C. told the social worker that she had not been emotionally, physically, or sexually abused, but had witnessed Father arguing with his wife. She stated that Father yelled and screamed at his wife, and once pulled her hair.

¶6            In January 2021, DCS substituted as the petitioner in the dependency action and obtained legal custody of K.C., with Grandmother retaining physical custody. Father pled no contest to DCS's allegations that he was unable to parent due to incarceration and had neglected K.C. by not giving Grandmother legal authority to care for her. Accordingly, at the beginning of April, the superior court found K.C. dependent as to Father. Later that month, DCS moved that Grandmother be appointed as K.C.'s permanent guardian. Father objected.

¶7            Meanwhile, in February, Father had written to DCS asking for visits with K.C., and the ongoing case manager asked K.C. about visiting Father. K.C. adamantly refused, stating that she did not care about Father and that it was good he was in prison because he deserved to be there.

¶8            The case manager eventually contacted Father's corrections officer in mid-May and was able to arrange for video visits. According to the case manager (though not documented in the available evidence), the first visit was set for May but K.C. refused to participate. K.C. then refused to participate in a visit in early June. K.C. explained afterwards to the case manager that she "just didn't want to do it." She added that Father was "sometimes . . . mean," that he would "yell[ ] and get[ ] angry" at her, and that she would "get in trouble" and he would "take[ ] [her] phone away." She did not answer when the case manager asked her if Father had ever hurt her or another in her presence.

¶9            Approximately a week after K.C. refused the June visit, Father moved the court to order visitation, arguing that he had not seen or talked to K.C. since October 2020 and opining that K.C. refused visits because she felt pressured to choose between Father and Grandmother. He asked that video visits be provided in a neutral setting away from Grandmother, and that K.C. be permitted to choose whether to participate in the visits once at the neutral setting. He stated that he had previously proposed this scheme as well as therapeutic visits to DCS without success.

¶10           DCS responded that "[w]hen the case aide has reached out to the child about setting up a visit, she refuses and informs the case aide she does not want a visit," and DCS was aware of no evidence implying interference by Grandmother. DCS stated that though it did not oppose

visitation in a neutral setting, it could not "force the child in the vehicle to . . . go to that neutral setting" if the child refused the visit, and "the parties are trying to follow the child's wishes in regards to visitation, and not force the child to do anything she does not want." DCS finally stated that it no longer offered therapeutic visitation and a similar service, called clinically supervised parenting time, was unavailable because it only takes place in the community or a therapist's office and is only for cases involving substantiated or alleged severe abuse, alienation, or similar conduct.

¶11　　　　In late June, the court directed Father to file a pleading regarding visitation and indicated that it would rule on the pleading. Father filed a new motion for visitation at the beginning of September. In response to the new motion, DCS stated that K.C. was now in therapy, that the therapist had decided it was not in K.C.'s interests to force her to talk about Father in therapy, and that though DCS would set up visits "[w]hen the child makes it know[n] she is open to exploring other options for a relationship with her Father and/or visits with him, . . . until that time, DCS will not force this child to go through with visits she is not wanting." Soon after DCS filed the response, Father withdrew his motion, stating that "[a]t this time, Father does not want to pursue the matter of visits with his Child while he is incarcerated."

¶12　　　　DCS had encouraged Father to take classes while imprisoned, and he did so. He completed at least thirty-three courses between December 2020 and August 2021. When questioned about Father's coursework, the case manager testified, "We noted that father was doing what he could in that situation, and that those kind of—that desire to change doesn't go unnoticed."

¶13　　　　DCS had also encouraged Father to send letters or pictures to K.C., and he started doing so in February 2021. But the case manager refused to pass on Father's first letter to K.C. because he, in the case manager's words, made inappropriate promises and threatened that he knew where Grandmother lived and would find K.C. there. DCS thereafter provided Father with guidelines for appropriate communications, and he sent multiple letters and coloring pages. Starting in March, the case manager brought the letters and coloring pages to her monthly meetings with K.C. At two of the meetings K.C. declined the case manager's offer to read Father's communications to her, and at every meeting she refused to write or draw something for Father, once going so far as to pretend that she did not know how to write. When K.C. began therapy in June to address her grief regarding Mother's death and her ongoing relationship with

Father, the case manager began forwarding Father's letters and pictures to the therapist to be reviewed with K.C. when therapeutically appropriate.

¶14        At intake for the therapy, K.C. stated Father used to yell at her and her siblings and that she was afraid of him.  She disclosed that she felt overwhelmed with thoughts about Father and wanted no contact with him.  Grandmother separately informed the therapist that K.C. was afraid of Father and did not want to talk about him or visit him.

¶15        The therapist decided not to share Father's letters and coloring pages with K.C. until K.C. felt ready to talk about Father.  Once therapy began, K.C. did not receive any of his missives except for one time in September, when a DCS worker mistakenly handed a letter directly to her.  The therapist further decided not to force K.C. to talk about Father, explaining to DCS in June that "push[ing] her to talk about him . . . can cause more trauma than helping out," and reiterating in July that "she will not force [K.C.] to talk about dad."

¶16        The case worker testified that "[w]henever [she] had asked how progress was going with [K.C.] and discussing the relationship with her father, . . . [the therapist] would discuss that—that it was always difficult to get [K.C.] to talk about.  She would typically kind of shut down and change the subject."  The therapist reported raising the issue of Father with K.C. two times.  First, at the initial session in June, she "talk[ed] to [K.C.] about how she is the one that is going to have to bring up her father if she wants to talk about him," and that this exchange "caused [K.C.] to get a little upset."  Then, in September, the therapist asked K.C. about an incident when she became upset about a sibling referring to her by her full name.  K.C. explained that she did not like her surname but would not elaborate, though according to Grandmother, K.C. dislikes the name because she shares it with Father.  The therapist then told K.C. that she had letters from Father, and K.C. responded that she "still did not want to talk [to] or see him."  In October, the therapist reported that because K.C. was doing well with respect to dealing with the loss of Mother, the therapist was looking at "possibly closing out.  This is due to her not wanting to talk about her dad and I will not cause more trauma by making her discuss this."

¶17        The permanent guardianship motion went to trial in late October.  After considering the evidence set forth above, the superior court granted the motion and dismissed the dependency.  Grandmother was given sole legal and physical custody of K.C., including sole discretion regarding visitation with Father.  Father appeals.

## DISCUSSION

¶18        The superior court may establish a permanent guardianship for a child if the movant provides clear and convincing evidence that the permanent guardianship is in the child's best interests and certain conditions are met.  A.R.S. §§ 8-871(A), -872(G); Ariz. R.P. Juv. Ct. ("Rule") 63(A), (C).  Only one of those conditions is at issue here: whether DCS "made reasonable efforts to reunite the parent and child and further efforts would be unproductive."  *See* A.R.S. § 8-871(A)(3).  We must accept the superior court's findings unless they are unsupported by reasonable evidence, and we must affirm the court's order unless it is clearly erroneous.  *Jennifer B. v. Ariz. Dep't of Econ. Sec.*, 189 Ariz. 553, 555 (App. 1997).  "In proceedings for permanent guardianship, the court shall give primary consideration to the physical, mental and emotional needs and safety of the child."  A.R.S. § 8-871(C); *see also* Rule 63(D)(3).

¶19        DCS need not provide services that would be futile, or provide every conceivable service.  *Cf. Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 34 (App. 1999) (examining what constitutes sufficient rehabilitative efforts in severance cases); *In re Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994) (same).  But the fact of a parent's short-term incarceration does not lessen the state's obligation to make diligent efforts to preserve the family.  *See Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574, 581–82, ¶¶ 17–21 (2021).

¶20        In the severance context, our supreme court recently held that when severance is sought based on the duration of a parent's prison sentence, if the parent "requests reunification services, such as visitation, and providing the services will not endanger the child, DCS must make reasonable efforts to provide these services."  *Id.* at 582, ¶ 21.  Similarly, we have held that visitation is a "particularly crucial" reunification service, that visitation is generally presumed to be in a child's best interests even when a parent is incarcerated, and that the parent "should be denied the right of visitation only under extraordinary circumstances."  *Michael M. v. Ariz. Dep't of Econ. Sec.*, 202 Ariz. 198, 200, ¶¶ 8–9 (App. 2002).  Typically, the denial of visitation must have "a specific evidentiary basis."  *Id.* at 201, ¶ 12.  For example, in *In re Maricopa Cnty. Juv. Action No. JD-5312*, we affirmed the termination of a mother's visits based on evidence that the visits caused the children to experience hyperactivity, destructivity, defiance, sleep issues, night terrors, diarrhea, clinginess, and irritability.  178 Ariz. 372, 376 (App. 1994).  And in *Jessie D.*, our supreme court found reasonable DCS's decision to not allow the children to speak with or view letters from their incarcerated father because a psychologist determined that the father had

sent letters and engaged in phone calls that were substantively inappropriate and caused the children to exhibit "undesirable behaviors." 251 Ariz. at 582, ¶ 24.

**¶21** We must first address DCS's contention that Father waived his objection to DCS's failure to provide visitation. Father requested visitation in February and sought judicial intervention in June, but he did not thereafter file a pleading as directed. His next filing was a September motion, which he withdrew soon thereafter. But though Father's visitation requests were intermittent and imperfect, it is clear on this record that he sought visitation on several occasions. It is also clear that Father consistently sought to maintain a relationship with K.C. through letters as directed by DCS. He also complied with the directive to take classes in prison. In view of Father's multiple requests for visitation, and his full engagement in all services DCS required, we conclude that the reasonableness of DCS's efforts is properly before us. *Cf., e.g., Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 179, ¶ 16 (App. 2014) (holding that "a parent who does not object" to the services provided is precluded from challenging a severance order's reasonable-efforts finding).

**¶22** Several months lapsed between when Father first requested visitation and DCS first provided it. The case manager explained, however, that "[t]here was difficulty getting into contact with" the appropriate corrections officer. DCS thereafter set up two visits. And then, after K.C. refused to participate in those visits, DCS appropriately sought therapy for K.C. designed in part to facilitate visitation by addressing her relationship with Father.

**¶23** The therapist vigorously and successfully pursued the issue of Mother's death with K.C., but left it to K.C. to raise the issue of Father and kept his written communications from her. The therapist's approach limited the reunification value of the therapy and Father's missives. But on this record, we cannot say that the superior court erred by accepting the therapy as forensically sufficient. First, though the therapist was presented with a client who disclaimed abuse, the record suggests good cause for K.C.'s reticence regarding Father: he had failed to care for her for a period of years, she was afraid of him, he yelled at her and others, and she saw him pull his assault victim's hair. Second, the therapist did bring up Father at least occasionally but, as with the case manager, K.C. refused to discuss him. The documentary evidence shows that the therapist told K.C. at the first session that she would need to be the one to bring up Father and K.C. got upset, and that several months later she told K.C. that Father had sent her letters and K.C. responded that she did not want to talk to or see him.

Further, the case manager testified that "whenever" she asked the therapist about K.C.'s progress, the therapist would report that it was "always" difficult to get K.C. to discuss Father.

¶24      Based on the specific facts of this case and the primacy of the child's best interests, we cannot say that the superior court clearly erred by accepting the therapy as a sufficient reunification service. Nor can we say that the court clearly erred by concluding that DCS's reunification efforts were reasonable and further efforts would be unproductive.

## CONCLUSION

¶25      We affirm the order granting Grandmother permanent guardianship of K.C. We note that though Father has lost custody of K.C., his parental rights have not been terminated. A.R.S. § 8-872(H); *see also Jennifer B.*, 189 Ariz. at 556. The superior court retains jurisdiction and may order further proceedings in accordance with K.C.'s best interests. A.R.S. § 8-872(J). Additionally, the guardianship may be revoked if Father proves a change in circumstances by clear and convincing evidence and revocation is in K.C.'s best interests. A.R.S. § 8-873(C).

