NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

BRANDEN M., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, A.C., GUARDIAN AD LITEM,
*Appellees*.

No. 1 CA-JV 20-0339
FILED 6-17-2021

---

Appeal from the Superior Court in Maricopa County
No. JD536473
The Honorable Sam J. Myers, Judge

**AFFIRMED**

---

COUNSEL

Czop Law Firm, PLLC, Higley
By Steven Czop
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Doriane F. Neaverth
*Counsel for Appellee Department of Child Safety*

Vierling Law Offices, Phoenix
By Thomas A. Vierling
*Counsel for Appellee A.C.*

## MEMORANDUM DECISION

Presiding Judge D. Steven Williams delivered the decision of the Court, in which Judge Jennifer B. Campbell and Judge James B. Morse Jr. joined.

**W I L L I A M S**, Judge:

¶1 Branden M. ("Father") appeals the juvenile court's appointment of a permanent guardian for his daughter, A.C. For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

¶2 A.C. was born in 2005. At some point, a Wyoming family court awarded Jessica C. ("Mother") sole custody of A.C. Later, Mother and A.C. moved to Arizona, and in 2007, the two moved in with Mother's boyfriend. Together, Mother and her boyfriend had two sons, who died in 2010 and 2013, and a daughter. There was repeated domestic violence in the household. Meanwhile, Father had no communication with A.C. until about 2016, when they had occasional in-person visits and telephone contact for about a year. Father also remained current on child support payments.

¶3 The Arizona Department of Child Safety ("DCS") became involved in October 2018, when Mother committed suicide. At that time, Father had not communicated with A.C. in over a year. When DCS interviewed Father, he stated that he had called the police twice in the past because of the domestic violence in Mother's home. DCS took custody of A.C. and filed a dependency petition, alleging that Father had failed to maintain a normal parent-child relationship with A.C.

¶4 Father, who still lived in Wyoming, agreed to, and the juvenile court ordered, the following services: a rule-out drug test, individual and family counseling (by self-referral), a parent aide, parenting classes, and supervised visitation. Father successfully completed all services. Although DCS offered Father visits with A.C., she almost always refused them. The court also ordered DCS to provide A.C. with "[t]rauma counseling through Arizona Children's Association."

¶5 In December 2018, Father moved under Arizona Rule of Procedure for the Juvenile Court 59, to have A.C. returned to him. At the

time, A.C., then 13 years old, adamantly insisted that she did not want to live with Father and refused to visit with him. Accordingly, the DCS unit psychologist recommended that A.C.'s therapist focus on her relationship with and feelings about Father before attempting reunification. Later that same month, Father and DCS stipulated to a dependency based solely on A.C.'s behaviors and the court set a case plan of family reunification. Father withdrew his Rule 59 motion and DCS initiated a professional evaluation of Father's home through the Interstate Compact for the Placement of Children ("ICPC"). At about the same time, A.C. began counseling through Arizona Children's Association ("AZCA") and soon afterwards transferred to the U-Turn Foundation for grief and loss counseling.

¶6            In January 2019, Father met with DCS during a visit to Arizona and said he wanted to have A.C. live with him. A.C. participated in an in-person visit with Father which A.C. reported "was quiet and felt weird." The next month, A.C. reiterated her desire to have no contact with Father. As of May 2019, A.C. still refused to speak with or visit him. That same month, Father moved to Arizona and asked for a referral to family counseling. The court ordered DCS to hold a child and family team meeting and have A.C.'s counselor opine about A.C.'s relationship with her Father. Because Father moved to Arizona, the ICPC closed without resolution.

¶7            At the same time, in May, the court transferred A.C. to a kinship placement with whom she had a significant relationship. Meanwhile, the U-Turn Foundation closed A.C.'s referral. Although A.C. had completed counseling, she had "become very guarded and [was] having a diff[icult] time opening up and addressing the loss of her mother." A.C. then resumed therapy through the AZCA.

¶8            In July, Father again moved under Rule 59 to have A.C. returned to him. This same month, A.C.'s clinical team at AZCA advocated against family therapy. The team instead recommended a specific form of reunification therapy because A.C. and Father had no prior relationship with each other. The next month, A.C. showed a fleeting willingness to visit Father. DCS referred Father for a parent aide and asked him to participate in individual therapy with a domestic-violence component, which he later completed. In September 2019, A.C. reported she had begun having "thoughts of death," and she became "withdrawn" during therapy. She also showed "acute anxiety" over the possibility of returning to Father.

¶9            In October 2019, the juvenile court denied Father's Rule 59 motion but ordered DCS to refer Father and A.C. for family therapy. At this point, DCS determined Father was a safe and appropriate caregiver, but

later thought A.C. needed more time to engage in services. By November, the recommended specialized form of reunification therapy was in place through Sage Counseling ("Sage"). However, the service could not be completed because A.C. was not willing to participate. Father requested that A.C. be transferred to a therapist specifically trained to address trauma. Although A.C.'s clinical care team at AZCA questioned whether this change was in A.C.'s best interests, DCS made the referral. In December, A.C.'s placement reported she stated that "if she has to go to her father that she will run away or kill herself."

¶10       Due to the limited number of qualified therapists and scheduling difficulties, A.C. did not begin trauma therapy until March 2020. She resisted engaging in trauma therapy but nevertheless participated for six months.

¶11       In July 2020, the juvenile court added a concurrent case plan of guardianship, and A.C.'s counsel and guardian ad litem ("GAL") filed competing guardianship motions. A.C.'s counsel moved for a guardianship with Mother's boyfriend, and the GAL moved for a guardianship with A.C.'s kinship placement. After a hearing, the juvenile court granted the GAL's motion to appoint A.C.'s placement as her permanent guardians. Father timely appealed that order. We have jurisdiction under Article 6, Section 9, of the Arizona Constitution and A.R.S. §§ 8-235(A), 12-120.21(A)(1), -2101(A)(1), and Arizona Rule of Procedure for the Juvenile Court 103(A).

## DISCUSSION

¶12       We review an order establishing a guardianship for clear error and will affirm unless no reasonable evidence supports the juvenile court's findings. *Jennifer B. v. Ariz. Dep't of Econ. Sec.*, 189 Ariz. 553, 555 (App. 1997). The juvenile court may establish a permanent guardianship of a child if the guardianship is in the child's best interests and four statutory requirements are satisfied. A.R.S. § 8-871(A). Father challenges only one statutory requirement on appeal. Specifically, Father challenges whether sufficient evidence supports the juvenile court's finding that DCS made reasonable efforts to unite him with A.C. and that further efforts would be unproductive. *See* § 8-871(A)(3).

¶13       "Reasonable efforts" do not require DCS to undertake futile efforts to unite parents and children, but do require DCS to "undertake measures [that have] a reasonable prospect of success." *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 34 (App. 1999) (discussing

reasonable efforts for termination cases). DCS must provide the parent "with the time and opportunity to participate in programs designed to help" reunite parent and child. *In re Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994) (stating similar rule in the context of termination cases). The court will "consider the availability of reunification services to the parent and his or her participation in those services." *Christina G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 231, 235, ¶ 14 (App. 2011). In guardianship cases, however, the court must "give primary consideration to the physical, mental and emotional needs and safety of the child." A.R.S. § 8-871(C).

¶14        Father first argues that DCS should have provided A.C. with therapy from a trauma-informed specialist at the start of the dependency. Although A.C. did not immediately receive therapy from a trauma-informed specialist, DCS had her therapy in place just two months after the dependency began with a therapist trained in behavioral health. At that time, A.C.'s therapist was aware of her traumatic history and was treating her for post-traumatic stress disorder. A.C.'s therapy plan included a goal of helping her to "cope and heal [from] the loss of her mother and brothers." A.C. also was treated through grief and loss therapy at the U-Turn Foundation, but unfortunately, she remained very resistant to discussing her Mother's death. When Father asked DCS to arrange therapy from a trauma-informed specialist, A.C.'s clinical team at AZCA recommended against it for two reasons: A.C. had not yet processed her Mother's death, and she could not maintain emotional stability long enough to address her trauma. Nonetheless, against clinical recommendations, A.C. received trauma therapy beginning in March 2020.

¶15        Father points to a single incident just before the guardianship hearing in which A.C. showed some positive curiosity towards him in therapy, and suggests that if she had received the service earlier, then "she may have been more open about her relationship with her father." Although A.C. acknowledged to her therapist that she might want to find out more about Father, she certainly did not say she wanted to live with or even visit him. She adamantly wanted to be in a guardianship and wanted no more involvement with DCS. Moreover, even in trauma therapy, A.C. generally would not discuss her past trauma and specifically asked her therapist not to talk about her Mother or Father. Indeed, as late as July 2020, A.C.'s therapist noted that A.C. "is talking and engaging but only processing at a superficial level."

¶16        At the guardianship hearing, A.C. stated that she "still [did] not want to have calls, visitations, or to live with [Father]." Indeed, A.C.'s

trauma therapist could not say when A.C. might be ready to speak with Father. And her therapist testified that A.C.'s best interests would be served, not by forcing her to have contact with Father, but by allowing her to approach contact with Father at her own pace. Considering A.C.'s resistance to processing her trauma in therapy and her refusal to have contact with Father throughout the dependency, it is not clear that she would have changed her view if she had only been offered trauma therapy earlier in the dependency.

¶17            Father next argues that DCS should have provided family therapy earlier in the dependency. When the dependency began, however, Father had not had any contact with A.C. for over a year, and he agreed to self-refer for individual and family therapy. Moreover, Father had been absent from A.C.'s life for about nine years before he reached out to her in 2016. In Father's absence, A.C. witnessed domestic violence between Mother and her boyfriend, and suffered the deaths of Mother and her two half-brothers. She was diagnosed with post-traumatic stress disorder and adjustment disorder with anxiety. Because A.C. displayed such strong resistance to any contact with Father, A.C.'s clinical care team noted in May 2019 that family therapy would be needed only "[i]f [the] judge orders re-unification."

¶18            Additionally, even though Father and A.C. received a specialized form of reunification therapy through Sage Counseling, A.C. refused to engage. Sage providers met with the parties and others involved in the case several times to brainstorm ways of securing A.C.'s participation. Sage providers adjusted their service based on strategies developed at these meetings, and offered therapeutically supervised phone calls between Father and A.C. and meetings in a neutral place. Despite these modifications, A.C. still refused to meet with Father.

¶19            In March 2020, given A.C.'s negative feelings towards Father and her refusal to participate, Sage therapists agreed that family therapy was not clinically appropriate at that time. Nevertheless, the referral remained available to Father and A.C. through May, and Sage agreed to rejoin the case if A.C. would participate in family therapy with Father.

¶20            On this record, we cannot say the juvenile court erred in finding that DCS made reasonable efforts to reunify the family and that further efforts would be unproductive.

## CONCLUSION

¶21      For the foregoing reasons, we affirm the order establishing a guardianship for A.C.



AMY M. WOOD • Clerk of the Court
FILED:   AA