971 P.2d 1046

**MARY ELLEN C., Appellant,**

v.

**ARIZONA DEPARTMENT OF ECONOMIC SECURITY and Destiny C., Appellees.**

**No. 1CA–JV 98–0130.**

Court of Appeals of Arizona, Division 1, Department A.

Jan. 19, 1999.

Carol Coghlan, Phoenix, Attorney for Appellant.

Mary C. McDonald, Glendale, Attorney for Appellee Child.

Grant Woods, Attorney General by Kim Zack, Assistant Attorney General, Mesa, Attorneys for Appellee Arizona Department of Economic Security.

## OPINION

FIDEL, Judge.

¶ 1 It is well established that the State, before acting to terminate parental rights, has an affirmative duty to make all reasonable efforts to preserve the family relationship. *See Maricopa County Juv. Action No. JS–6520,* 157 Ariz. 238, 241, 756 P.2d 335, 338 (App.1988); *see also Maricopa County Juv. Action No. JA 33794,* 171 Ariz. 90, 91–92, 828 P.2d 1231, 1232–33 (App.1991). The case law has been inconsistent, however, in establishing whether this affirmative duty entails an obligation to make a reasonable effort to rehabilitate a parent who suffers from a disabling mental illness. We hold in this opin-

ion that, although the State is not obliged to undertake futile rehabilitative measures, it is obliged to undertake those which offer a reasonable possibility of success. We then consider whether the State met its obligation to make a reasonable rehabilitative effort in the underlying case. Finding that the State did not make such an effort, we reverse the juvenile court termination order that gives rise to this appeal.

## I. History

¶ 2 Mary Ellen C. is the natural mother of three daughters, one of whom, Destiny C., is the subject of this proceeding. Destiny, born July 15, 1990, in Phoenix, Arizona, is presently eight years old. Destiny's putative birth father is deceased.

¶ 3 On May 15, 1995, a Child Protective Services (CPS) caseworker investigated a report that Mary kept rats in her apartment and that she frequently left Destiny, then four, and her thirteen-year-old sister Jennifer home alone. The caseworker found the home to be filthy; ten to twenty-five rats occupied unclean cages in the children's bedroom, and the apartment emitted a strong odor.

¶ 4 Later that day, police discovered that Mary was the subject of outstanding arrest warrants. When they returned to Mary's apartment to arrest her, CPS took temporary custody of Destiny and Jennifer.

¶ 5 Mary spent five nights in jail. Shortly after her release, she was evicted from her apartment and lived with a friend for approximately six weeks. A period of homelessness followed, during which Mary sought assistance from a church and spent one night in a shelter. Eventually, Mary moved into a one-bedroom trailer with a friend, where she remained until approximately July 1997, when she took up residence with the parents of Harold H., a man to whom she had become engaged.

¶ 6 Meanwhile, after a contested hearing on October 31, 1995, the juvenile court adjudicated the children dependent, placed Jen-

nifer in a group foster home, and placed Destiny with a foster family. Destiny has remained in the same placement since 1995, and her foster parents wish to adopt her.

¶ 7 By February 1996, CPS had maintained custody of Mary's children for the better part of a year, yet had not referred her to parenting classes; had referred her for a clinical interview in November 1995, but had not yet referred or directed her to counseling; and, aside from arranging visitation,[1] had not yet provided her any services directed toward reunification with her children. Witness Sue Weil, who became Mary's caseworker in February 1996, could not explain "why services were not started prior to the time I got the case."

¶ 8 In April 1996, Weil referred Mary to parenting classes, which she attended and completed. And two months later, more than a year after CPS took custody of Mary's children, Weil referred her to Dr. Armando Bencomo for psychological evaluation.

¶ 9 Dr. Bencomo interviewed Mary on June 18, 1996, reviewed referral information from CPS, administered psychological tests, and concluded that Mary suffered from major depression, post-traumatic stress disorder, a possible learning disability or borderline IQ, and dependent personality disorder with self-defeating features. Although Dr. Bencomo rendered a guarded prognosis, he also held out the prospect that, with intensive psychiatric services, Mary might be turned around:

This client is poorly equipped to function independently, much less to take care of a child. She needs intensive mental health services. She should be evaluated psychiatrically with consideration of antidepressant medication and perhaps another medication to help her with her increasing paranoid ideation. She would probably benefit from participation in a day treatment program more than from individual counseling alone. Ideally, she should be on SSI and in a semi-sheltered residential program where she can have a reasonable level of nutrition and adequate housing.

1. Although Mary was essentially homeless and lacked transportation, she regularly made her

scheduled visitation with her daughters.

Once she is having her survival needs adequately met and is stabilized psychiatrically, she would benefit from referral to the state Vocational Rehabilitation agency.

I doubt that Mary can sufficiently address all of her mental health issues in less than one year. Long term foster care or relative placement for Jennifer may be appropriate, and *Destiny might be a candidate for adoption. However, intensive psychiatric services might turn Mary around sooner than I expect, so you may wish to wait another six months before changing the case plan, in order to see if she avails herself of services and improves in her emotional and social adjustment.*

¶ 10 CPS did not follow Dr. Bencomo's recommendation to await a trial of intensive psychiatric services before changing the case plan. Nor did CPS make any significant effort to assist Mary to receive psychiatric services. Instead, in August 1996, after reviewing Dr. Bencomo's report, caseworker Weil provided Mary with the phone number for ComCare, the State's contract mental health provider, and encouraged her to "self-refer." Then, in November 1996, CPS changed Destiny's case plan to "severance and adoption" because, as Weil explained, Destiny had been in a stable foster placement for eighteen months and Mary "had made some progress but not very much" in stabilizing her living arrangements and mental health. In November 1996, however, although Mary had diligently followed-up on Weil's referral to ComCare, she still had a month to wait before receiving even a psychiatric evaluation from ComCare.

¶ 11 Mary did manage to receive some counseling and medication through ComCare before the end of 1996, and in January 1997, on her own initiative, she obtained a job as a waitress. Around this time, Ms. Weil noted "a change in her affect, her verbalizations. She wasn't as defensive or hopeless...." Yet neither Ms. Weil, who left the case in January 1997, nor her successor, Joan John-son, obtained ComCare records or reports concerning Mary's progress.

¶ 12 In February 1997, the State petitioned to sever Mary's parental relationship with Destiny. As grounds, the State alleged that Mary suffered from a mental illness that rendered her incapable of parenting the child, that this circumstance was likely to "continue for a prolonged indefinite period," and that Mary had not remedied and was unlikely to remedy the conditions that had necessitated Destiny's out-of-home placement for a period exceeding eighteen months. *See* Ariz.Rev.Stat. Ann. ("A.R.S.") § 8–533(B)(3) and (B)(7)(b).

¶ 13 In October 1997, Dr. David Young conducted a psychological evaluation of Mary pursuant to court order. Dr. Young interviewed Mary, administered psychological tests, and reviewed information provided by CPS, including Dr. Bencomo's psychological evaluation of June 1996. During the interview, Mary reported that she had received approximately six counseling sessions from ComCare. Dr. Young did not seek or review ComCare records or reports.

¶ 14 Dr. Young diagnosed (1) dysthymia,[2] (2) parent/child relational problem, (3) neglect of child, and (4) borderline personality disorder. He reported that Mary's lack of progress after an extended period of services from CPS rendered her prospects for functional improvement "dismal."

¶ 15 The juvenile court conducted a severance hearing in March and April 1998. Dr. Young testified that Mary's "disorder and how she handles her problems are having a significant negative impact upon her parenting of a child." When asked if Mary's borderline personality disorder rendered her incapable of discharging her parental responsibilities, he responded, "[a]t the level that she is displaying it, yes."

¶ 16 Dr. Young acknowledged that all of Mary's diagnosed conditions were amenable to treatment. He rendered a negative prognosis, however, based upon what he under-

**2.** According to Dr. Young, dysthymia is "one of the descriptions of depression, involving low self-esteem, feelings of inadequacy, difficulty functioning on a rather chronic level. It's not to the point where it's incapacitating for a person. One, they feel quite uncomfortable, unhappy with their circumstances and their relationship as well as self-esteem."

stood to be Mary's minimal accomplishments since the time of Destiny's removal:

> Based upon her performance in the past she is likely not going to be able to accomplish those things that have been asked of her in the foreseeable future. To rectify those things would require a great deal of effort, consistency and commitment. Based upon the past review of her efforts and accomplishments they have been quite poor. It is likely that she is not going to be able to make the major changes in the foreseeable future.

¶ 17 Dr. Young was asked to elaborate on the history and assumptions that underlay his negative assessment of Mary's progress:

A. I had asked her what she had accomplished and she had outlined to me what I reported in my report.

Q. Which would be what?

A. Well, she was residing with her boyfriend. She was not employed. She was not in therapy at the time. She was not on medications for sleep. And that is essentially what she outlined to me what she had accomplished.

Q. Did you explore at all with either her or CPS why she was not in counseling at the time?

A. I'm not sure why she was not in counseling except that it was required of her and asked of her and she wasn't complying.

Q. Did CPS ever tell you what counseling she was required to be in?

A. No.

Q. Was there any reference to the counseling that she was required to be in the materials that were provided to you by CPS?

A. Well, I would have to refer to the previous reports on that issue. Essentially she needed to address the issues that were—that brought them into care.

Dr. Young added that Mary's six counseling sessions at ComCare were inadequate to address her need.

¶ 18 As it happened, Dr. Young's assumptions were mistaken. Although he assumed that CPS had provided Mary with significant mental health services and that Mary had been recalcitrant in taking advantage of them, all that CPS had provided was the phone number of ComCare, whose services, according to Weil, Mary had diligently pursued. Although Dr. Young assumed that Mary was non-compliant by terminating her counseling after an inadequate six sessions, the evidence was undisputed that these six sessions were all that ComCare had made available to her by the time of his interview.

¶ 19 Dr. Young did not review records or reports from ComCare, although he agreed that such information would have been pivotal in evaluating Mary's progress:

A. Seeking treatment and participating in treatment is not in itself either a guarantee that a person has improved nor is it a demonstration that it has not worked either. So it depends on the reports that were received concerning the progress.

Q. Have you received or were you provided a copy of any reports from ComCare to review regarding my client's participation in ComCare, her diagnoses, her medications, and her carrying through with those medications? Anything at all of that nature?

A. No.

¶ 20 By the time of trial, some six months after Dr. Young evaluated her, Mary was receiving regular counseling and medication services through ComCare. She was receiving social security disability payments. She had been steadily employed as a part-time waitress for almost six months and had held employment during approximately thirteen of the past sixteen months.[3] Between social security and her earnings from employment, Mary had personal income of $930 per month. Mary had married her fiance in October 1997, two weeks after her examination by Dr. Young, her husband was employed, and Mary and her husband owned a four-bedroom home. When asked whether any of these facts would alter his prognosis,

---

**3.** Mary had worked as a waitress from January through August 1997. She was between jobs when interviewed by Dr. Young on October 3, 1997, and resumed new employment in November 1997, which she held in April at the time of trial.

Dr. Young testified that he could not offer an opinion regarding Mary's current circumstances because he had not examined her since October 1997.

¶ 21 Dr. Young was not alone in his inability to assess Mary's current circumstances. As noted earlier, none of Mary's CPS caseworkers had pursued meaningful contact with her physicians· or counselors at Com-Care. Indeed, Joan Johnson, who succeeded Sue Weil as Mary's caseworker and retained that position at the time of trial, had not pursued meaningful contact with Mary herself. Johnson's primary contact with Mary was during supervised visitation. Ms. Johnson had not interviewed Mary's husband, checked into his background, or visited Mary's home. She explained,

> I don't think that's the issue. I think what we are looking at is, you know, I have had the case only for this period of time. The evaluation people have made recommendations as team members, you know, to helping us make this decision. And I don't think the home is necessarily an issue. It's, you know, her ability to parent, and I think that's been evaluated, clinically by, you know, several people.

Ms. Johnson added that the clinical evaluations she referred to were those of Drs. Young and Bencomo, but admitted that neither of those doctors had provided ongoing counseling to Mary or seen her interact with Destiny.

¶ 22 At the conclusion of the hearing, the juvenile court terminated Mary's parent-child relationship with Destiny. Finding that "[d]espite her efforts, [Mary] was unable to remedy the circumstances which cause the child to reside in an out-of-home placement," that Mary suffered from a borderline personality disorder "so severe that she is incapable of adequately parenting a child," and that "[t]his disorder is not likely to be resolved in the foreseeable future," the juvenile court found severance appropriate under A.R.S. § 8–533(B)(3) and (B)(7)(b). The juvenile court also concluded that a severance would benefit Destiny by facilitating her adoption into a permanent, stable home.

4. In 1998, the legislature reduced the out-of-home-placement criterion of subsection 8–

¶ 23 On the question whether the State had provided Mary with the requisite remedial services, the juvenile court made the following findings:

> The child was taken into [CPS] custody in May 1995. . . . Since her removal, [CPS] has offered and referred [Mary] a variety of reunification services, including psychological testing, drug testing, parenting education, housing, vocational training, visitation, and referral to ComCare for mental health services.

¶ 24 On appeal, Mary challenges the sufficiency of the evidence in support of each of these findings. We reverse because the court lacked evidence to support the conclusion that Mary had received the requisite reunification services or that a reasonable effort to preserve the family had failed.

## II. A REASONABLE EFFORT

### A. The State's Duty

■■■ ¶ 25 To accomplish a severance of parental rights, the State must establish each of the requisite elements by clear and convincing evidence. *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *Pima County Severance Action No. S–1607*, 147 Ariz. 237, 238, 709 P.2d 871, 872 (1985). A reviewing court will accept the juvenile court's findings in support of severance unless those findings are clearly erroneous. *Maricopa County Juv. Action No. JS–6520*, 157 Ariz. 238, 241, 756 P.2d 335, 338 (App.1988).

■■■ ¶ 26 Before terminating the parent-child relationship, the juvenile court must determine that at least one of the statutory grounds for severance applies. *Maricopa County Juv. Action No. JA 33794*, 171 Ariz. 90, 92–93, 828 P.2d 1231, 1233–34 (App.1991). At the time of the trial,[4] the pertinent statutory grounds were these:

> Evidence sufficient to justify the termination of the parent-child relationship shall include any one of the following . . . :
>
> . . . .

533(B)(7)(b) from eighteen to fifteen months. 1998 Ariz. Sess. Laws Ch. 276 § 13.

3. That the parent is unable to discharge the parental responsibilities because of mental illness, ... and there are reasonable grounds to believe that the condition will continue for a prolonged indeterminate period.

....

7. That the child is being cared for in an out-of-home placement under the supervision of the juvenile court, the division or a licensed welfare agency, that the agency responsible for the care of the child has made a diligent effort to provide appropriate reunification services and that either of the following circumstances exists:

....

(b) The child has been in an out-of-home placement for a cumulative total period of eighteen months or longer pursuant to court order, the parent has been unable to remedy the circumstances which cause the child to be in an out-of-home placement and there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future.

A.R.S. § 8–533(B).

¶ 27 The juvenile court found in Mary's case that the State had established both of the quoted statutory grounds for severance of parental rights. The court additionally found that a severance would serve the best interests of the child—a necessary element in any severance under Arizona law. *See Maricopa County Juv. Action No. JS–500274*, 167 Ariz. 1, 4–5, 804 P.2d 730, 733–34 (1990).

¶ 28 The dispositive question in this case is whether the State established an additional element that turns upon the State's own conduct. Did the State prove that it had made reasonable efforts to preserve the family relationship? *See Maricopa County Juv. Action No. JS–6520*, 157 Ariz. at 241, 756 P.2d at 338; *Maricopa County Juv. Action No. JA 33794*, 171 Ariz. at 91–92, 828 P.2d at 1232–33.

¶ 29 A preliminary question, however, is whether the State is obliged to make such efforts before seeking a severance on the statutory basis that a parent suffers from a mental illness of prolonged and indefinite duration. *See* A.R.S. § 8–533(B)(3).

¶ 30 If the State's duty to make reasonable preservative efforts were merely statutory, the text of A.R.S. § 8–533(B) might give reason to question whether that duty applies to a severance sought on mental illness grounds. As this court observed in a 1992 decision, part 3 of subsection 8–533(B), the part relating to mental illness, does not expressly include language "requiring that DES make 'diligent efforts' to reunify the family." *Matter of Appeal in Yuma County J–88–201, J–88–202, J–88–203*, 172 Ariz. 50, 53 n. 2, 833 P.2d 721, 724 n. 2 (App.1992). Part 7, in contrast, expressly requires that the State "ma[k]e a diligent effort to provide appropriate reunification services." The contrast between part 3 and other parts of A.R.S. § 8–533(B) led this court to suggest in dictum in *Yuma County J–88–201* that the State need not make a diligent reunification effort before seeking a severance on mental illness grounds. *Id.*[5]

¶ 31 We reject the *Yuma County* dictum for two reasons. First, it overlooks a statutory requirement that implicitly incorporates the obligation to make *reasonable* efforts to preserve the family before seeking a severance on mental illness grounds. Specifically, the statute permits a severance only if the illness renders the parent "unable to discharge the parental responsibilities ... and there are reasonable grounds to believe that the condition will continue for a prolonged indeterminate period." A.R.S. § 8–533(B)(3). It is inherent within this requirement that the condition be proven not to be amenable to rehabilitative services that could restore a mentally ill parent's ability to care for a child within a reasonable time.

¶ 32 Second, by engaging in a purely statutory analysis, the *Yuma County* opinion overlooked that Arizona courts have not de-

5. To suggest that the State had no duty to make a diligent reunification effort was dictum because it was not a basis for the court's decision. The court resolved the case by deciding that the State

*had* made a diligent—indeed, a "prolonged, painstaking"—effort to reunify the family. *Id.* at 54, 833 P.2d at 725.

fined the State's duty to make reasonable efforts to preserve the family as a duty merely statutory in origin. Rather, our courts have defined it on constitutional grounds as a necessary element of any state attempt to overcome what the United States Supreme Court has described as the "fundamental liberty interest of the natural parents in the care, custody and management of their child." *Santosky v. Kramer*, 455 U.S. at 753, 102 S.Ct. 1388; *see also JS–500274*, 167 Ariz. at 5, 804 P.2d at 734 (the "important consideration" in severance cases "is that there are fundamental constitutional rights involved"). Thus, in *Juv. Action No. JA 33794*, this court stated, "The combined effect of the fundamental character of a parent's right to his child and the severity and permanence of termination dictates that the court sever the parent-child relationship only in the most extraordinary circumstances, when all other efforts to preserve the relationship have failed." 171 Ariz. at 91–92, 828 P.2d at 1232–33.

¶ 33 Arizona courts have long required the State, in mental-illness-based severances, as in others, to demonstrate that it has made a reasonable effort to preserve the family. *See Pima County Severance Action No. S–2397*, 161 Ariz. 574, 577, 780 P.2d 407, 410 (App.1989) (severance on grounds of mental illness upheld where evidence established "that no other services could be offered that had not already been offered that might preserve the family"); *Maricopa County Juv. Action No. JS–5209 & No. JS–4963*, 143 Ariz. 178, 189, 692 P.2d 1027, 1038 (App.1984) (duty to attempt reasonable rehabilitation satisfied where mentally ill mother was provided the type of therapy that offered the most hope of enabling her to carry out parental responsibilities); *see also Maricopa County Juv. Action No. JS–6520*, 157 Ariz. 238, 245, 756 P.2d 335, 342 (App.1988) (State established that mentally ill parent was not amenable to any treatment program).

■ ¶ 34 In short, because fundamental interests are no less involved in mental-illness-based severances than in others, the principle is no less applicable in mental-illness-based severances than in others that "termination of the parent-child relationship should not be considered a panacea but should be resorted to only when concerted effort to preserve the relationship fails." *Department of Economic Sec. v. Mahoney*, 24 Ariz.App. 534, 537, 540 P.2d 153, 156 (1975); *see also JS–500274*, 167 Ariz. at 4–5, 804 P.2d at 733–34 and cases cited therein. This principle does not oblige the State to undertake rehabilitative measures that are futile. *See JS–5209*, 143 Ariz. at 189, 692 P.2d at 1038. It does, however, oblige the State to undertake measures with a reasonable prospect of success.

### B. The State's Failure to Satisfy its Duty

■ ¶ 35 CPS offered Mary no significant reunification services for almost a year after removing Destiny from her care. It waited more than a year after removing the child before referring a mother with a serious mental illness for a psychological evaluation and did not steer her to ComCare for treatment until three months more had passed. As for steering Mary to Comcare, which was the sum total of CPS's response to Dr. Bencomo's recommendation of intensive psychiatric services, CPS gave Mary a phone number, encouraged her to self-refer, and never followed up sufficiently to secure ComCare records of her progress.

¶ 36 Up to October of 1997, Mary received six sessions of counseling at ComCare. This level of intervention obviously fell short of Dr. Bencomo's recommendation, and Dr. Young testified that six sessions could not adequately address Mary's needs.

¶ 37 Although CPS need not provide "every conceivable service," it must provide a parent with the time and opportunity to participate in programs designed to improve the parent's ability to care for the child. *Maricopa County Juv. Action No. JS–501904*, 180 Ariz. 348, 353, 884 P.2d 234, 239 (App.1994). The State does not provide such opportunity or make a "concerted effort to preserve" the parent-child relationship when it neglects to offer the very services that its consulting expert recommends.

¶ 38 In *JS–5209*, before approving a termination on mental illness grounds, this court observed that CPS had provided "the

type of therapy [that] offered the most hope for enabling the mother to carry out her parental responsibilities." 143 Ariz. at 189, 692 P.2d at 1038. In *Pima County S–2397*, before approving a termination on mental illness grounds, we observed that no other services could be offered that had not already been offered and which might preserve the family. 161 Ariz. at 577, 780 P.2d at 410. In *J–88–201*, another termination on grounds of mental illness, we described DES's reunification effort as "prolonged, painstaking, yet futile." 172 Ariz. at 54, 833 P.2d at 725. Here, in contrast, we may accurately describe DES's effort as belated, fitful, and indifferent.[6]

¶ 39 Nor did the State introduce clear and convincing evidence that additional services would have been futile. Although Mary's caseworker identified a lack of improvement in Mary's mental health as the primary basis for the decision to seek a severance, CPS made the decision to seek a severance without checking ComCare records and before ComCare had provided Mary even a psychiatric evaluation. Subsequently, as CPS pursued its goal of severance, it made only a negligible effort to learn what services Mary was receiving or how she was progressing. CPS neglected even to secure such information for Dr. Young, yet relied upon his assessment of Mary's progress to support severance, and asked the juvenile court to do the same.

¶ 40 CPS witnesses testified that Mary participated fully in all of the services offered to her and put forth her best efforts; yet this information they also failed to convey to Dr. Young. By the time of trial, according to Mary's evidence, her efforts were beginning to bear some fruit, despite the inadequate level of services available from ComCare. CPS offered no evidence to rebut Mary's recent progress, and Dr. Young, who was unaware of it, could offer no opinion as to its import.

¶ 41 According to Dr. Young, Mary's condition was "technically" amenable to treatment. Dr. Young's opinion that Mary would not improve was based on his own misconception that CPS had offered Mary the "intensive" psychiatric services Dr. Bencomo recommended, and that Mary had not availed herself of them. Because Dr. Young's opinion rested upon incorrect assumptions, it did not suffice to support a finding that additional services would be futile.

¶ 42 To establish a severance, CPS was obliged to prove by clear and convincing evidence that it had made a reasonable effort to provide Mary with rehabilitative services or that such an effort would be futile. CPS fell far short of this mark. On the record before us, the juvenile court could not reasonably conclude that the State made a concerted or diligent or reasonable effort to preserve the parent-child relationship.[7]

### III. CONCLUSION

¶ 43 This case is troubling because the evidence is abundant that a present severance would serve Destiny's best interests by facilitating her adoption by foster parents who have provided her a stable home for the

---

6. The State offered evidence that, because Mary qualified for mental health services under Title IX, CPS policy prohibited her caseworker from making other, potentially duplicative referrals. The State also offered evidence that ComCare's financial difficulties at the time of Mary's referral may have prevented Mary from receiving extensive care. Such circumstances, in our view, neither relieved CPS of its obligation to provide Mary reasonable rehabilitative services nor excused CPS's failure to monitor her receipt of such services before seeking to sever her parental rights on grounds of incapacitating mental illness.

7. Because we conclude that the State failed to demonstrate reasonable efforts to preserve the family, we need not linger over the parties' argu-

ments regarding the sufficiency of the evidence to support the asserted statutory grounds for severance. It is evident from our conclusion, however, that the State failed to prove that it had made "a diligent effort to provide appropriate reunification services," as it was statutorily obliged to prove pursuant to A.R.S. § 8–533(B)(7)(b), in order to achieve a severance on the ground of extended out-of-home placement. Further, the State's failure to show that it had provided reasonable rehabilitative services precluded it from proving under A.R.S. § 8–533(B)(3) that "there are reasonable grounds to believe the parent's condition will continue for a prolonged, indeterminate period." *See Maricopa County Juv. Action No. JS–5209 & No. JS–4963*, 143 Ariz. 178, 184, 692 P.2d 1027, 1033 (App. 1984).

last three and one-half years. Yet the law does not permit a severance to be predicated solely on the best interests of the child. *See Maricopa County Juv. Action No. JS-500274*, 167 Ariz. 1, 5, 804 P.2d 730, 734 (1990). Interference with a parent's fundamental right to the care, custody and control of her child is not permitted "merely because the child might be better off in another environment." *Maricopa County Juv. Action No. JS-6520*, 157 Ariz. 238, 244, 756 P.2d 335, 341 (App.1988).

¶ 44 This case is equally troubling because, while critical months stretched into years of out-of-home placement for Destiny, the State made only a negligible effort to provide rehabilitative services to her needy mother. This failure, harmful to all parties, has prevented the State from establishing a necessary element of its case. Because the State has failed to establish by clear and convincing evidence that it made a reasonable effort to preserve this family, we reverse the juvenile court's severance order and remand this matter for further proceedings consistent with this opinion.

GERBER, Presiding Judge, and GRANT, Judge, concur.