NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

HARRY W., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, L.M., *Appellees*.

No. 1 CA-JV 21-0029
FILED 10-5-2021

Appeal from the Superior Court in Maricopa County
No. JD31089, JS20594
The Honorable Michael J. Herrod, Judge

**AFFIRMED**

COUNSEL

Harry W., Henderson, NV
*Appellant*

Arizona Attorney General's Office, Tucson
By Jennifer R. Blum
*Counsel for Appellee Department of Child Safety*

_____

**MEMORANDUM DECISION**

Judge Jennifer M. Perkins delivered the decision of the Court, in which Presiding Judge Cynthia J. Bailey and Judge Maria Elena Cruz joined.

_____

**P E R K I N S**, Judge:

**¶1** Harry W. ("Father") appeals the superior court's order terminating his parental rights to his child. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

**¶2** Father and Stephanie C. ("Mother") are the biological parents of L.M., born in August 2015. Father and Mother conceived the child while Mother was in a relationship with LaJerrick M. ("Boyfriend"). In December 2014, Father moved to Missouri and began dating a woman who is now his wife. Mother informed Father of her pregnancy and sent him a photograph of L.M. shortly after his birth. But she also told Father that he was not L.M.'s biological father. Yet Father knew he may be L.M.'s father.

**¶3** The Department of Child Safety ("DCS") took custody of L.M. at birth because of Mother's methamphetamine abuse and mental health issues. A dependency ensued, and Mother told DCS that Boyfriend was L.M.'s father and that he signed an affidavit of paternity. Contrary to Mother's representations, DCS learned years later that no such affidavit exists. Mother also called Father and told him L.M. was in DCS's custody.

**¶4** In August 2015, Father's wife called DCS twice to report that Father may be L.M.'s biological father and that he wanted custody of him. Father called DCS the next month and asked L.M.'s case manager to call him back. Father's wife called DCS again in October 2015 and asked the case manager to return her call as soon as possible. She reiterated that Father wanted custody of L.M. and asked whether Father should come to Arizona to take a paternity test. Father testified that DCS failed to respond to any of the four calls, and DCS presented no evidence that it responded to them.

**¶5** Father did not contact DCS again after October 2015, and he did nothing more to establish paternity or a relationship with L.M. In

December 2015, the juvenile court returned L.M. to Mother and Boyfriend's custody and dismissed the dependency. Father knew at some point that L.M. was no longer in DCS's custody, but he took no action and "wait[ed] to [see] what cards [he] was dealt."

**¶6**          In December 2018, DCS retook custody of L.M. because Mother was reportedly abusing substances, engaging in domestic violence, neglecting L.M. and her other children, and physically abusing one of her other children. The DCS case manager did not review the 2015 records and notes about the telephone calls from Father and his wife. Mother continued to identify Boyfriend as L.M.'s father, but Boyfriend completed a paternity test in June 2019 that proved otherwise. Once in foster care, L.M. displayed self-harming behaviors and disclosed serious abuse he suffered in Mother and Boyfriend's care.

**¶7**          Around February 2020, Mother informed Father that DCS retook custody of L.M. and that Boyfriend was not L.M.'s biological father. Father then called DCS, stating he may be L.M.'s biological father. The case manager referred Father for a paternity test.

**¶8**          In August 2020, DCS moved to terminate Father's parental rights to L.M. based on abandonment. *See* A.R.S. § 8-533(B)(1). That same month, testing confirmed Father's paternity of L.M. The case manager called Father in September 2020 to gauge his ability to parent L.M., but DCS stated Father refused to discuss his past and he "ended the call rather abruptly." After confirming Father's paternity, DCS filed an amended dependency petition alleging that L.M. was dependent as to Father because of his abandonment and neglect. The case manager then sent Father a service letter, asking him to complete a rule-out drug test. Father tested positive for marijuana, a legal recreational drug in Nevada, where Father was living at the time.

**¶9**          After a three-day consolidated hearing, the juvenile court found L.M. dependent as to Father and terminated his parental rights. Father timely appealed. We have jurisdiction under A.R.S. § 8-235(A).

## DISCUSSION

**¶10**          On appeal, Father challenges the superior court's termination order. We review the termination of parental rights for an abuse of discretion. *Titus S. v. Dep't of Child Safety*, 244 Ariz. 365, 369, ¶ 15 (App. 2018). The juvenile court may terminate a parental relationship upon proof of one statutory ground under A.R.S. § 8-533(B) by clear and convincing evidence. *Id.* Clear and convincing means the grounds for termination are

3

"highly probable or reasonably certain." *Kent K. v. Bobby M.*, 210 Ariz. 279, 284–85, ¶ 25 (2005). The court also must find that termination is in the child's best interests by a preponderance of the evidence. *Id.* at 285, ¶ 29. On appeal, due process requires us to assess whether a reasonable factfinder could conclude, based on the record, that the State has met its clear and convincing evidentiary burden to sustain the termination of parental rights. *See Santosky v. Kramer*, 455 U.S. 745, 747–48, 769 (1982).

¶11    We will uphold the juvenile court's findings of fact "if supported by adequate evidence in the record." *Christy C. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 445, 452, ¶ 19 (App. 2007) (cleaned up). "The juvenile court, as the trier of fact in a termination proceeding, is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002). We do not reweigh the evidence, but "look only to determine if there is evidence to sustain the court's ruling." *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004).

¶12    Under A.R.S. § 8-531(1), abandonment means:

> the failure of a parent to provide reasonable support and to maintain regular contact with the child, including providing normal supervision. Abandonment includes a judicial finding that parent has made only minimal efforts to support and communicate with the child. Failure to maintain a normal parental relationship with the child without just cause for a period of six months constitutes prima facie evidence of abandonment.

"[A]bandonment is measured not by a parent's subjective intent, but by the parent's conduct." *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249, ¶ 18 (2000). When ruling on an abandonment allegation, courts should consider whether a parent has provided "reasonable support," "maintain[ed] regular contact with the child and provided normal supervision." *Kenneth B. v. Tina B.*, 226 Ariz. 33, 37, ¶ 18 (App. 2010).

¶13    For the first time in this case, Father argues that "the Arizona Termination of Parental Rights Statutory Scheme is [u]nconstitutional" because it "does not adequately safeguard fundamental . . . rights." More specifically, Father argues that the definition of abandonment in A.R.S. § 8-

531(1) is overly broad, suggesting that the court should consider evidence of a parent's conduct only after paternity is established. He seems to contend that the only way to establish paternity is through DNA testing and DCS has a duty to find the biological father in each case. And as part of that duty, DCS should have required Mother and Boyfriend to complete DNA testing in the first dependency.

**¶14**     A parent must timely raise any constitutional challenge to a statute so that the other parties and the juvenile court may address it. *See Ramsey v. Yavapai Family Advoc. Ctr.*, 225 Ariz. 132, 137, ¶ 18 (App. 2010) (in the context of motions for reconsideration, "when a new [constitutional] argument is raised for the first time . . . the prevailing party below is routinely deprived of the opportunity to fairly respond."); *Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 178–79, ¶ 16 (App. 2014) ("[A] parent's failure to assert legitimate complaints in the juvenile court about the adequacy of services needlessly injects uncertainty and potential delay into the proceedings, when important rights and interests are at stake and timeliness is critical."). Because he failed to raise these arguments below, Father waived them on appeal. *See Englert v. Carondelet Health Network*, 199 Ariz. 21, 26 (App. 2000) (we generally do not "consider issues, even constitutional issues, raised for the first time on appeal").

**¶15**     Waiver notwithstanding, Father's suggestion that DNA testing is the only vehicle to establish paternity is contrary to the law. *See* A.R.S. §§ 8-106.01 (a person seeking paternity may obtain notice of adoption proceedings by filing a notice with the putative fathers registry), 25-807 (proceedings to establish maternity and paternity), 25-812 (when entered by clerk of the superior court, a voluntary acknowledgment of paternity "has the same force and effect as a judgment"), 25-814 (paternity presumptions); *Andrew R. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 453, 459–60, ¶¶ 23–24 (App. 2010) (means of establishing paternity and limitations on challenging a voluntary acknowledgment of paternity).

**¶16**     Mother misled DCS and the juvenile court in the first dependency proceedings to incorrectly believe Boyfriend established paternity of L.M. But Father knew he may have been L.M.'s biological parent and still failed to file a notice with the putative fathers registry, did not seek to establish paternity, and failed to challenge any voluntary acknowledgment of paternity that Boyfriend may have signed. Instead, Father sat idly by, waiting to "[see] what cards [he] was dealt." Father's suggested interpretation goes against the strong public intent of the paternity and child safety statutes to "advance a child's best interest by

providing that child with permanency." *Andrew R.*, 223 Ariz. at 460, ¶ 24. L.M.'s best interests required more action than Father undertook.

**¶17** Father next contends the abandonment ground in the parental termination statute is unconstitutional because it does not explicitly require DCS to make diligent efforts to provide a parent with appropriate reunification services. *See* A.R.S. § 8-533(B)(1). Citing *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, Father also argues DCS failed to make reasonable efforts to preserve the family because DCS did not verify his paternity for several years. 193 Ariz. 185 (App. 1999).

**¶18** But Father did not raise this constitutional argument below. *See Englert*, 199 Ariz. at 26–27. And absent any existing parent-child relationship, the Constitution does not require DCS to provide an unwed biological father with reunification services before it seeks to terminate his rights based on abandonment. *Toni W. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 61, 66 (App. 1999). Moreover, *Mary Ellen C.* is inapposite here because it pertains to termination based on mental illness, not abandonment. 193 Ariz. at 192, ¶ 34.

**¶19** Father also argues that DCS violated his due process rights by ignoring his telephone calls in 2015, that insufficient evidence supports the court's abandonment finding., and that, in the alternative, he had just cause to abandon L.M. While "parents with an existing parental relationship . . . are entitled to the highest constitutional protection, an unwed father must first take steps to establish a parent-child relationship before he may attain the same protection." *In re Pima Cty. Juv. Severance Action No. S-114487*, 179 Ariz. 86, 93–94 (1994).

**¶20** In 2015, Father demonstrated some "commitment to the responsibilities of parenthood" shortly after L.M.'s birth. *See S-114487*, 179 Ariz. at 97. DCS's failure to respond at that time implicates the fundamental fairness concerns that Father raises. But regardless of DCS's failures, we agree with the juvenile court that Father "could not sit on his rights" and "had a duty to act."

**¶21** Father testified that despite Mother's denial, he knew it was possible that he was L.M.'s father. When Father called DCS in 2015, he told L.M.'s case manager that he believed he could be L.M.'s father and wanted custody of him. But he also believed that beyond his initial calls to DCS, there was "nothing [more he] could do about" the situation. Father believed that even after the juvenile court dismissed the first dependency, Mother

"didn't want [him] to be the father" and did not want Father or L.M. to be DNA tested.

¶22 The record is plain that when DCS failed to respond to his phone calls, Father took no more steps to establish paternity. He never filed a petition, nor sought legal advice about how to do so. Father also presented no evidence that he ever filed a claim with the putative fathers registry. *See* A.R.S. § 8-106.01(A). Father also failed to intervene in L.M.'s initial dependency or assert his belief that he was L.M.'s father, as he did in July 2020.

¶23 Between December 2015, when the juvenile court dismissed the dependency, and February 2020, Father took no steps to establish paternity, provided no support for L.M., and maintained no contact with him. During this four-year period, L.M. was severely abused and neglected. And the record supports the case manager's testimony that other than establishing paternity in September 2020, Father provided L.M. no support and "made [no] attempts over the past five years to . . . engage in any sort of relationship with" him. Thus, reasonable evidence supports the juvenile court's finding that Father abandoned L.M.

¶24 Yet Father argues that he had just cause for abandoning L.M. because: Mother told Father he was not L.M.'s parent; Mother rarely contacted Father; Mother gave Father a false name for L.M.; and Mother did not tell DCS that Father could be L.M.'s parent. As discussed above, Father initially suspected he might be L.M.'s father but, beyond calling DCS a handful of times, he took no action to establish paternity or otherwise assert his legal rights to L.M. until 2020. *See Michael J.*, 196 Ariz. at 250, ¶ 22 ("[W]hen circumstances prevent [a parent] from exercising traditional methods of bonding with his child, he must act persistently to establish the relationship however possible and must vigorously assert his legal rights to the extent necessary." (cleaned up)). The court did not err in determining that "Mother's actions do not rise to the level of interference required to establish a defense to abandonment." *Cf. Calvin B. v. Brittany B.*, 232 Ariz. 292, 297, ¶¶ 21–25 (App. 2013) (father continually sought visitation with child through both mother and the court, despite mother's attempts to restrict father's contact).

¶25 Finally, Father also asserts error in the juvenile court's dependency findings, which twice use Boyfriend's name instead of Father's. This appears to be a clerical error—the court's surrounding findings all use Father's name and when the court entered the findings, Boyfriend's rights were no longer at issue. *See In re Marbella P.*, 223 Ariz.

159, 160, ¶ 4 n.3 (App. 2009) (the court treated the omission of the word "not" from the transcript as a typographical error).

## CONCLUSION

**¶26**     We affirm.



AMY M. WOOD • Clerk of the Court
FILED:    AA