NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

### DIVISION ONE

IN RE TERMINATION OF PARENTAL RIGHTS AS TO K.C.

No. 1 CA-JV 23-0229
FILED 06-27-2024

Appeal from the Superior Court in Maricopa County
Nos. JD535564, JS520700
The Honorable Pamela S. Gates, Judge
The Honorable Adele Ponce, Judge

**AFFIRMED**

COUNSEL

Denise L. Carroll, Attorney at Law, Scottsdale
By Denise L. Carroll
*Counsel for Appellant Mother*

The Czop Law Firm, PLLC, Higley
By Steven Czop
*Counsel for Appellant Father*

Gillespie, Shields & Taylor, Mesa
By Mark A. Shields, Jeffrey McCombs
*Counsel for Appellees*

---

**MEMORANDUM DECISION**

Judge Michael J. Brown delivered the decision of the Court, in which Presiding Judge Samuel A. Thumma and Judge Jennifer B. Campbell joined.

---

**B R O W N**, Judge:

**¶1**　　　　Malorie R. ("Mother") and Kevin C. ("Father") appeal from the juvenile court's termination of their parental rights to their child, K.C., based on abandonment. Because neither parent has shown that the court erred, we affirm.

## BACKGROUND

**¶2**　　　　Mother, who is diagnosed with a mild intellectual disability, was born in 1988. After her own mother passed away, a guardian was appointed for Mother in 2003 until Mother "aged out of the system." Mother gave birth to K.C. in April 2020. Through the first two years of K.C.'s life, Mother and Father's relationship was abusive, with several instances of domestic violence where Mother was the victim. In late 2021 or early 2022, the relationship between Mother and Father ended. The last time Father acknowledged being in the same room with K.C. was either in January or February 2022.

**¶3**　　　　K.C. had several health concerns early on, and by April 2022 she had been diagnosed with failure to thrive. Throughout this time, Isaac and Heather ("Petitioners"), who are Mother's brother and sister-in-law, frequently looked after K.C. Petitioners had also been appointed as permanent guardians for Mother's older daughter (born in 2017), after Mother's rights to that child had been terminated in a prior proceeding.

**¶4**　　　　In April 2022, K.C. began living with her older half-sister and Petitioners full time. The reasons for this move are disputed. Mother claimed she entrusted K.C. to Petitioners' care because she had been in an abusive relationship. But according to Mother's guardian, Mother had asked the Petitioners take in and raise K.C., because Mother "felt she could not raise her properly" and Mother wanted K.C. "to be raised with [K.C.'s] sister." Through text messages, Mother told Heather, "I know [K.C. is] gonna be really happy especially knowing she [is] with a mom and a dad and her [sister]" and that Mother was "[s]orry [she] couldn't provide the

best family" like the one Petitioners have. She also asked Petitioners whether she will "always be a mom" in discussing the move. Mother went on to say that "[I] brought them into the world," but that she could not "even take care of them at all and now [Petitioners] have to." Several weeks later, Mother signed a temporary guardianship form giving Petitioners custody of K.C.

**¶5** In the months that followed, Mother frequently reached out to Heather to ask how K.C. was doing and for pictures of the children. Text messages, however, reveal that Mother rarely explicitly asked to see K.C., the first instance occurring in July 2022. Heather cautioned that seeing Mother again would interrupt the process of K.C. adapting to life with Petitioners, and that Mother and Petitioners had discussed K.C. needing "a substantial break." Heather then told Mother they would resume the conversation in person, and the matter was not brought up again. Mother and Heather seemed to communicate semi-regularly until around April of 2023, with Mother asking about K.C. and requesting pictures. From the record on appeal, the only other time Mother asked to see K.C. in person came in August 2023.

**¶6** Sometime before the summer of 2023, Mother communicated with an attorney to inquire about regaining custody of K.C. The attorney contacted law enforcement and tried to convince them that Petitioners were engaged in "felony custodial interference." Police went to Petitioners' home to perform a welfare check, but took no other action regarding K.C. In June 2023, Petitioners filed a petition to terminate Mother and Father's parental rights as to K.C., alleging, in relevant part, abandonment. As to Mother only, the petition also alleged mental health and prior termination within the last two years for the same cause as additional grounds.

**¶7** In August 2023, the juvenile court ordered that a social study be conducted and that the Department of Child Safety ("DCS") conduct an investigation. Following their investigation, DCS disagreed with the termination petition, and instead wanted to provide Mother with reunification services, though DCS did recommend that K.C. remain with the Petitioners. DCS then filed a dependency petition as to Mother and Father. The dependency and termination cases were later consolidated, and the court held a three-day adjudication hearing in November 2023 on dependency and termination.

**¶8** At the hearing, social worker Polly Thomas, who had authored the social study, testified as to her findings after communicating with Mother, Father, and Petitioners. Thomas recommended termination,

noting that she believed it would be in K.C.'s best interests and that the Petitioners were able to provide a safe environment for K.C. Thomas also explained that K.C. and her older sibling had a close bond and that reunification would have a negative impact on their relationship. On cross-examination Thomas acknowledged that guardianship could also be in K.C.'s best interests, and with certain safeguards could be a viable alternative. The attorney with whom Mother communicated earlier in 2023 briefly testified about his efforts to aid Mother.

¶9            Heather testified that Mother had willingly entrusted K.C. into their care. Heather stated that she had never interfered with Mother's ability to visit or contact K.C., nor did she ignore Mother's messages or other communications. Isaac affirmed Heather's testimony, and further explained that K.C. was doing well living in their home, that she recognized him and Heather as her parents, and that reunification with Mother and Father would be detrimental to K.C.'s best interests. Mother's guardian corroborated Petitioners' claims that Mother had willingly given K.C. to them with an intention of adoption, and reunification would be detrimental to K.C.

¶10           Father, who had been homeless in the two years since he had last seen K.C., also testified. He acknowledged he was not currently able to care for K.C., but believed he would be able to if provided services by DCS. He also said that Isaac had threatened him with "physical harm." Mother testified after Father, claiming she had given K.C. to Petitioners only to protect K.C. from domestic violence, and that Petitioners had blocked her from communicating with them to make arrangements to see K.C. Mother's roommate corroborated Mother's testimony that she had not intended to give K.C. to Petitioners for the purpose of adoption.

¶11           On the final day of the hearing, the DCS case manager opined that reunification services would be appropriate for Mother and described what services DCS intended to offer. But the case manager declined to offer an opinion on whether termination would be in K.C.'s best interests. She also testified about two virtual visits that Mother recently had with K.C. The case manager explained that K.C. seemed "terrified" during the first visit and did not want to engage, and that there was minimal if any improvement in K.C.'s engagement during the second visit.

¶12           Following the hearing, the juvenile court issued a detailed order terminating both parents' rights based on abandonment. *See* A.R.S. § 8-533(B)(1). The court determined (1) there was no "credible evidence to support" a finding that Petitioners had prevented or restricted Mother's

"interactions with the child," and (2) that Mother "did not make reasonable efforts to maintain contact with [K.C.]" after the child was placed in Petitioner's care. The court also found that termination was in K.C.'s best interests, citing the health concerns K.C. had while in Mother's care before April 2022 and Father's lack of a stable home. The court further noted that K.C. "bonded closely to the [Petitioners] and her sister" and that severing those bonds by reunifying K.C. "would be devastating and traumatic."

¶13        The court then deemed DCS's dependency petition moot, and appointed Petitioners "as the legal guardian" of K.C., "vesting them with legal decision-making authority" over her. Father and Mother each filed timely notices of appeal from the termination order. We have jurisdiction under A.R.S. § 8-235(A).

## DISCUSSION

¶14        Mother argues (1) she was entitled to continue with DCS's reunification services before the juvenile court could terminate her parental rights; (2) depriving her of the opportunity to participate in reunification services violated the Americans with Disabilities Act ("ADA"); (3) Petitioners failed to prove abandonment because they prevented her from seeing K.C.; and (4) the court erred in finding that termination was in K.C.'s best interests. Father challenges only the court's best interests finding.

### A.        Reunification Services

¶15        Mother argues that she should have been allowed to participate in the services offered by DCS before the court could terminate her parental rights, and that she was constitutionally entitled to such services. She relies on this court's decision in *Mary Ellen C. v. Ariz. Dep't of Econ Sec.*, 193 Ariz. 185 (App. 1999), a case involving termination due to the mother's mental health, A.R.S. § 8-533(B)(3). In those circumstances, this court held that DCS "must provide a parent with the time and opportunity to participate in programs designed to improve the parent's ability to care for the child." *Mary Ellen C.*, 193 Ariz. at 192, ¶ 37. This duty arises from the fact that parents have a "fundamental liberty interest . . . in the care, custody, and management of their child," *Santosky v. Kramer*, 455 U.S. 745, 753 (1982), combined with the "severity and permanence of termination," *Mary Ellen C.*, 193 Ariz. at 192, ¶ 32.

¶16        Mother's rights, however, were not terminated due to her mental health. Instead, the juvenile court based its decision to terminate her parental rights on abandonment. In *Toni W. v. Ariz. Dep't of Econ Sec.*, 196 Ariz. 61, 66, ¶ 15 (App. 1999), this court held that the reasoning in *Mary*

*Ellen C.* that compels DCS to provide reasonable reunification services does not extend to abandonment. In cases where a parent has abandoned a child, "a biological parent's interest in the child is nothing more than a genetic link." *Id.* Under that circumstance, the parent-child relationship is "devoid of 'the full commitment to the responsibilities of parenthood' that warrants substantial protection of the parental interests under the [United States Constitution]." *Id*. at 66, ¶ 14 (citation omitted). Thus, reunification efforts are not constitutionally required before the court terminates parental rights due to abandonment. *Bobby G. v. Ariz. Dep't of Econ. Sec.*, 219 Ariz. 506, 510, ¶ 11 (App. 2008).

**¶17**        Nor does anything in our statutes require the provision of services by DCS before terminating parental rights based on abandonment, especially in a private termination proceeding. *Compare* A.R.S. § 8-533(B)(8), (11)(b) *with* § 8-533(B)(1). Accordingly, the court was not required to find that Mother was provided reunification services before terminating her rights based on abandonment.

### B.        ADA Claim

**¶18**        Mother argues that termination of her parental rights constituted disability discrimination under the ADA. Given that Mother did not raise this issue in the juvenile court, she has waived it on appeal. *Logan B. v. Dep't of Child Safety*, 244 Ariz. 532, 536, ¶ 9 (App. 2018). Despite waiver, the court's ruling did not violate the ADA, which states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132. It is true that "DCS must provide a disabled parent . . . with reunification services that comply with the ADA," however, "Arizona's statutory requirement that DCS make reasonable efforts to provide reunification services satisfies the ADA's reasonable accommodation requirement." *Jessica P. v. Dep't of Child Safety*, 251 Ariz. 34, 38–39, ¶¶ 14–15 (App. 2021).

**¶19**        Mother contends the court denied her the opportunity to participate in reunification services by terminating her parental rights before having the chance to engage in services. But this alone is not sufficient to create a claim of discrimination by a public entity under the ADA. Assuming that Mother is a qualified individual with a disability under the ADA, Mother has not shown that she was excluded from participation in these services *because of her disability*. *See* 42 U.S.C. § 12132. To the extent the court's action precluded Mother from engaging in reunification services, it did so based on her abandonment of K.C., not by

reason of her disability. Moreover, Mother has not shown that she has been denied access to services that are otherwise available to other parents whose rights are being terminated on grounds of abandonment. *See In re Welfare of H.S.*, 973 P.2d 474, 481 (Wash. Ct. App. 1999) ("The [ADA] does not require public entities to provide the disabled with services not offered to others.").

### C.       Evidence of Abandonment

**¶20**        Mother next challenges the court's finding that she abandoned K.C. In reviewing a court's termination order, we accept a juvenile court's factual findings if reasonable evidence and inferences support them. *Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, 478, ¶ 30 (2023). We will affirm the court's legal conclusion that clear and convincing evidence met the statutory ground unless it is clearly erroneous. *Id.* at 478–79, ¶ 31. We view the facts in a light most favorable to sustaining the court's findings. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 2, ¶ 2 (2016).

**¶21**        Mother argues the court ignored evidence that Petitioners intentionally interfered with her attempts to maintain a parental relationship with K.C. In *Calvin B. v. Brittany B.*, 232 Ariz. 292, 297, ¶¶ 21–24 (App. 2013), a private termination action, this court determined the evidence supporting an abandonment finding was lacking because the parent petitioning for termination intentionally interfered with the other parent's ability to contact the child and maintain a parental relationship. Mother contends that facts are similar in this case, because Petitioners "convinced [her] that she couldn't see the child until 6 months went by." The record does not support Mother's contention.

**¶22**        Heather testified that Petitioners never (1) prevented Mother from contacting or spending time with K.C., (2) ignored Mother's communications, or (3) otherwise prevented Mother from having access to K.C. Though Mother testified that she made other attempts to request visits with K.C., the court noted that "[t]he credible evidence belies this assertion" and that the court "did not hear any credible evidence to support that the [Petitioners] prevented [Mother] from having contact with [K.C.]." The credibility of witnesses and which testimony the court believes are "uniquely the province of the juvenile court." *Jesus M. v. Ariz. Dep't of Econ Sec.*, 203 Ariz. 278, 282, ¶ 12 (App. 2002). Likewise, in *Calvin B.* this court noted that the father had "actively sought more involvement with their son than [Mother] would allow." *Calvin B.*, 232 Ariz. at 297, ¶ 22. In contrast, our record shows only two instances over the course of a year and a half in which Mother explicitly requested to see K.C. Even assuming Petitioners

denied those requests, Mother has not shown she actively sought involvement in K.C.'s life so as to overcome a finding of abandonment.

¶23        Aside from the alleged interference, reasonable evidence supports the court's finding that Mother abandoned K.C.  Proving abandonment required Petitioners to prove that Mother failed "to provide reasonable support and to maintain regular contact with the child, including providing normal supervision."  A.R.S. § 8-531(1).  Petitioners also needed to prove that Mother "made only minimal efforts to support and communicate with [K.C.]." *Id.*  Though Mother did communicate with Petitioners and asked them to tell K.C. that Mother loved her, the record shows only two instances where Mother asked to have contact with K.C.  Likewise, Heather testified that Petitioners had not received any meaningful support from Mother while caring for K.C., and that Mother "ha[d] not contributed a toy, a card, a letter, nothing."  The juvenile court could reasonably conclude that Mother failed to provide reasonable support or maintain regular contact with K.C.

¶24        Mother argues that Petitioners did not meet this standard.  She claims that, due to her intellectual disability and age, she did not understand what steps she would need to take to get K.C. back from Petitioners, but despite such disability she engaged with an attorney in an effort to get K.C. back.  But "abandonment is measured not by a parent's subjective intent, but by the parent's conduct," with the central inquiry being "whether a parent has provided reasonable support, maintained regular contact, made more than minimal efforts to support and communicate with the child, and maintained a normal parental relationship." *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249–50, ¶ 18 (2000).  Though Mother may not have foreseen the full ramifications of her conduct, our analysis is focused on the conduct itself.  And while it is true that Mother briefly engaged with an attorney to regain custody of K.C. in 2023, such action does not erase the fact that Mother had provided little to no support of K.C. for more than a year by that point.  The court had sufficient evidence to conclude, by clear and convincing evidence, that Mother had abandoned K.C.

### D.    Best Interests

¶25        Mother and Father challenge the juvenile court's finding that termination would be in K.C.'s best interests.  The party seeking termination of parental rights must show termination is in the child's best interests by a preponderance of the evidence. *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 22 (2005).  A court may find that termination is in the child's best

interests if (1) the child will benefit from termination; or (2) the child would be harmed if termination is denied. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 150, ¶ 13 (2018). The court must consider the totality of the circumstances in assessing whether termination is in the child's best interests. *Id.* The court's primary concern in this analysis is the child's interest in stability and security. *Id.* at ¶ 12.

**¶26** Both parents argue that the court's determination was erroneous due to several issues in the testimony presented at trial. They first point to the DCS case manager's opinion that termination was not warranted, and that allowing time to participate in reunification services would be preferable. Father asserts that DCS's position of neutrality in this case cannot be overstated. But neither Father nor Mother cite any authority that requires the court to prioritize the opinions of DCS personnel over other testimony and evidence, and the weight to give such testimony falls squarely on the trier of fact, not this court. *See Jesus M.*, 203 Ariz. at 282, ¶¶ 11–12.

**¶27** The parents also point to testimony by Thomas (social worker) when she acknowledged that guardianship could be a viable alternative to termination. But Thomas also testified that termination would ultimately be in K.C.'s best interests. Additionally, in performing the social study, Thomas found that K.C. was "loved and secure in the environment where all her emotional, and physical needs are met in a timely manner."

**¶28** Father contends the court failed to appropriately weigh his circumstances in deciding that termination was in K.C.'s best interests. But we will not reweigh the evidence on appeal. *Id.* Further, the totality of the circumstances presented to the court supports its findings. The court heard testimony about the bond K.C. shares with her sister and Petitioners, which reunification could potentially damage, along with opinions from other members of K.C.'s family that termination was in her best interests. Based on this evidence, we cannot say it was clearly erroneous for the court to conclude that termination would benefit K.C., or that failing to terminate Mother and Father's parental rights would harm K.C.

**CONCLUSION**

¶29      We affirm the juvenile court's termination of Mother and Father's parental rights.



AMY M. WOOD • Clerk of the Court
FILED:    AGFV