NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

TUESDAY B., ADRIAN T.,
*Appellants*,

v.

DEPARTMENT OF CHILD SAFETY, A.T., A.T.,
*Appellees*.

No. 1 CA-JV 21-0112
FILED 10-26-2021

Appeal from the Superior Court in Maricopa County
No. JD532398
The Honorable Kristin Culbertson, Judge

**AFFIRMED**

COUNSEL

David W. Bell Attorney at Law, Higley
By David W. Bell
*Counsel for Appellant Tuesday B.*

Denise L. Carroll, Esq., Scottsdale
By Denise L. Carroll
*Counsel for Appellant Adrian T.*

Arizona Attorney General's Office, Mesa
By Amanda Adams
*Counsel for Defendant/Appellee*

---

**MEMORANDUM DECISION**

Judge David D. Weinzweig delivered the decision of the Court, in which Presiding Judge Peter B. Swann and Judge Paul J. McMurdie joined.

---

**W E I N Z W E I G**, Judge:

¶1 Tuesday B. ("Mother") and Adrian T. ("Father") appeal the juvenile court's termination of their parental rights to daughters Alexa and Bonnie.[1] Because we find no error, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

¶2 Mother and Father are the biological parents of Alexa, born in August 2018, and Bonnie, born in August 2019. The Department of Child Safety ("DCS") learned about Alexa shortly after her birth, when Alexa, Mother and Father tested positive for marijuana. Mother had no medical marijuana card. She had also tested positive for marijuana at a prenatal visit several months earlier. She told DCS investigators she had been diagnosed with post-traumatic stress, bipolar and anxiety disorders but refused to take medication. She acknowledged that PTSD affected her parenting. DCS investigators also learned that Mother and Father had a significant history of domestic violence. By this time, Chandler police were familiar with the couple, often responding to domestic disturbances at their apartment. Father was charged with disorderly conduct for pushing Mother while she was pregnant in 2018, and pled guilty to three separate disorderly conduct designated as domestic violence offenses between 2018 and 2019.

¶3 Once discharged from the hospital, Mother took Alexa home, and DCS implemented a safety plan to prevent domestic violence and drug use, which required daily visits from a paternal aunt. But Mother and Father continued to fight, and Chandler police continued to respond, and the family was soon evicted from their apartment. The family bounced around from there, first living with maternal grandmother for a few weeks, then living with a paternal uncle for a few weeks, then returning to grandmother after uncle's girlfriend secured an order of protection against Mother. The domestic violence continued at each stop, and police officers

---

[1] We use pseudonyms to protect the daughters' identities.

responded to more reports of domestic violence. Mother tested positive for methamphetamine in January 2019.

¶4 The juvenile court found Alexa dependent as to both parents in March 2019. It found her dependent as to Mother on grounds of substance abuse, domestic violence and mental health issues, and found her dependent as to Father on grounds of substance abuse and domestic violence. She was placed in a foster home.

¶5 Bonnie was born about five months later, in August 2019. Like Alexa, Bonnie was born substance-exposed to marijuana. The juvenile court found Bonnie dependent as to both parents on the same grounds cited for Alexa. DCS placed the sisters in the same foster home.

¶6 Shortly after each child was born, DCS referred Mother to Dr. Alex Levitan, a clinical psychologist, for a psychological evaluation. At the first evaluation in April 2019, Mother shared her childhood trauma and reliance on marijuana. Dr. Levitan diagnosed her with PTSD and an "unspecified cannabis-related disorder," which "are likely to negatively impact her ability to parent effectively." He concluded the children are "likely to be at an increased risk" for several reasons, including that Mother "is unable to provide her child with a safe and consistent home environment," "[s]he does not appear to have her own home," and "collateral records note that previously she resided in a location with transient individuals using methamphetamine," which "is concerning [because] a child raised in an unsafe, substance exposed home environment may be at an increased risk." He found that Mother had a "good" chance "to demonstrate minimally adequate parenting skills in the foreseeable future," but her success would "depend[] on her willingness to engage in proposed interventions," including drug treatment and drug testing, domestic violence counseling, and trauma-focused therapy from a master's or doctorate level provider.

¶7 At the second evaluation in November 2020, Dr. Levitan was less optimistic about Mother's chances of safely parenting because "[s]he appears to have many of the same concerns and maladaptive coping strategies outlined in the previous psychological evaluation," and "[t]here is concern that she has not demonstrated significant behavioral change and continues to minimize concerns."

¶8 DCS also referred Mother and Father for random and regular drug testing over nearly 30 months—from November 2018 until January

2021. Mother and Father missed the bulk of these tests and failed the rest for marijuana.

¶9             Mother and Father were referred for substance-abuse treatment. DCS referred Mother four separate times for substance-abuse treatment (December 2018, February 2019, July 2019 and October 2019). Mother never completed the program. And when the provider said Mother was no longer eligible for substance-abuse treatment, having acquired a medical marijuana card, the provider still offered her mental-health services. She declined. Meanwhile, DCS referred Father six separate times for substance-abuse treatment (December 2018, March 2019, July 2019, October 2019, January 2020 and April 2020). Father did not complete the first five programs, but he completed the sixth program in April 2020.

¶10           Moreover, DCS offered the parents an array of other services, including parent-aide services, but neither parent completed the services. And by September 2019, the parent-aide provider reported little to no progress or improvement in their protective capacities and parenting skills. The parents remained without stable housing in October 2019.

¶11           DCS moved to terminate the parent-child relationships in July 2020, and the juvenile court held a severance trial in January 2021. The court heard testimony from various witnesses, including Dr. Levitan and the case manager for DCS. Dr. Levitan testified that Mother had a "poor" prognosis for safely parenting in the foreseeable future and was likely to deny her limitations and minimize valid concerns about her parenting skills. The case manager testified the parents would be unable to exercise proper and effective parental care and control in the near future because they continued to elevate their needs above the children's needs and did not exercise impulse control. She also testified that neither parent had provided proof of income or stable housing. She told the court that Father's substance abuse would continue for a prolonged, indeterminate period, citing Father's extended history of use and abuse, failed drug tests, inconsistent participation and the number of referrals required before Father completed a treatment program. She testified the children were living together in an adoptive placement that met their needs and were "doing very, very well."

¶12           In March 2021, the juvenile court terminated Mother's parental rights to both children on the statutory grounds of prolonged substance abuse, mental illness and time in care (six and nine months for both children; 15 months for Alexa). The court terminated Father's parental rights on the same grounds, except for mental illness. Mother and Father

timely appealed. We have jurisdiction. *See* A.R.S. §§ 12-2101(A), -120.21, 8-235.

## DISCUSSION

### I. DCS offered appropriate rehabilitation services to Mother

**¶13** Mother does not challenge the juvenile court's findings that she cannot discharge her parental responsibilities because of her substance abuse or that her substance abuse will continue for a prolonged indeterminate period. Instead, on appeal, she argues the court erred in finding that DCS made a diligent effort to provide appropriate reunification services. This court will accept the superior court's findings of fact unless no reasonable evidence supports them. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002).

**¶14** DCS must make diligent efforts to rehabilitate the parent and reunify the family before parental rights are severed on grounds of substance abuse. *Jennifer G. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 450, 453, ¶ 12 (App. 2005). To satisfy this requirement, DCS must show it made reasonable efforts to preserve the family, "undertook measures with a reasonable prospect of success," and provided parents "with the time and opportunity to participate in programs designed to improve [their] ability to care for the child," but DCS need not provide every conceivable service. *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶¶ 34, 37 (App. 1999).

**¶15** The record includes reasonable evidence to support a finding of diligent efforts on the ground of substance abuse. DCS offered appropriate reunification services for Mother to address her substance-abuse issues. Mother received four separate referrals for substance-abuse treatment but completed none. And when the substance-abuse treatment provider offered her mental-health services, she declined. DCS referred Mother for random and regular drug testing from November 2018 until January 2021. She often missed the tests and failed the rest for marijuana.

**¶16** Mother received many parenting services. DCS referred her for parent-aide services, which she never completed. DCS also provided SENSE family preservation services, visitation and transportation assistance. *See Maricopa Cnty Juv. Action No. JD–5312*, 178 Ariz. 372, 375 (App. 1994) ("[v]isitation with the child may be critical to the parent's ability" to show child should be returned to his custody). Dr. Levitan recommended that Mother participate in counseling, but she declined to do

so. Mother also declined when DCS arranged counseling through Southwest Behavioral. Finding no error, we affirm.[2]

## II. The record supports the juvenile court's decision to terminate Father's parental rights on chronic substance abuse grounds and its best-interests finding

¶17 To terminate Father's parental rights, the juvenile court must find clear and convincing evidence supporting at least one statutory ground under A.R.S. § 8-533(B), and that termination is in the child's best interests by a preponderance of the evidence. *Jeffrey P. v. Dep't of Child Safety*, 239 Ariz. 212, 213, ¶ 5 (App. 2016). We accept the court's factual findings unless no reasonable evidence supports them and affirm a termination order unless it is clearly erroneous. *Jesus M.*, 203 Ariz. at 280, ¶ 4.

¶18 Father contests the statutory ground of chronic substance abuse, which requires proof that (1) he has a "history of chronic abuse of dangerous drugs [or] controlled substances," that (2) makes him "unable to discharge parental responsibilities," and (3) "there are reasonable grounds to believe that the condition will continue for a prolonged indeterminate period." A.R.S. § 8-533(B)(3). "Chronic substance abuse is long-lasting but not necessarily constant substance abuse." *Jennifer S. v. Dep't of Child Safety*, 240 Ariz. 282, 287, ¶ 17 (App. 2016). Father contends the juvenile court erroneously found that his substance abuse would continue and prevent him from exercising proper and effective parental care and control.

¶19 We affirm because reasonable evidence supports the juvenile court's findings. The court reasoned that Father's substance abuse would continue based on his extensive history of substance abuse and treatment failures. Father had used marijuana since he was a teenager. He never demonstrated a sustained period of sobriety during the dependency, failed to complete substance-abuse treatment until the sixth referral, and continued to test positive. *Jennifer S.*, 240 Ariz. at 287, ¶ 17 (temporary abstinence does not generally outweigh a parent's "significant history of abuse" or "consistent inability to abstain during [the] case," and "a child's interest in permanency must prevail over a parent's uncertain battle with" substance abuse) (quotation omitted). The children were toddlers—ages one and two—and the court heard evidence that marijuana would harm Father's problem solving and response time. The court also heard evidence

---

[2] Because the record supports the ground of substance abuse, we do not reach the remaining grounds. *Jesus M.*, 203 Ariz. at 280, ¶ 3.

of Father's multiple encounters with law enforcement and failure to maintain housing or employment.

**¶20** Father also argues the court erroneously found that termination was in the children's best interests. To terminate parental rights, the juvenile court must find by a preponderance of the evidence that termination is in the children's best interests. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 149-50, ¶ 8 (2018). Termination is in a child's best interests if "(1) the child will benefit from the severance; or (2) the child will be harmed if severance is denied." *Id.* at 150, ¶ 13. A "child's interest in stability and security" is paramount. *Id.* at ¶ 12 (citation omitted).

**¶21** The record includes ample evidence to support the juvenile court's finding of best interests. The court found "[t]he children would benefit from termination because they would live in a home that is free from substance abuse and domestic violence." The court also found the children are in stable and nurturing placements where their needs have been met, the children have thrived in the placement, and the placement intends to adopt both children. *See Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 50, ¶ 19 (App. 2004); *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 335, ¶ 8 (App. 2004) ("In combination, the existence of a statutory ground for severance and the immediate availability of a suitable adoptive placement for the children frequently are sufficient to support a severance order.").

**¶22** Father counters with evidence he considers more favorable to his position, but we do not reweigh the evidence on appeal. *Jennifer S.*, 240 Ariz. at 286-87, ¶ 16. Finding no error, we affirm.

## CONCLUSION

**¶23** We affirm.



AMY M. WOOD • Clerk of the Court
FILED:
JT