NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

IN RE TERMINATION OF PARENTAL RIGHTS AS TO M.L. and Y.L.

No. 1 CA-JV 25-0014

FILED 10-02-2025

Appeal from the Superior Court in Maricopa County
No. JD510807
The Honorable Adele Ponce, Judge

**AFFIRMED**

COUNSEL

David W. Bell, Attorney at Law, Higley
By David W. Bell
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Jennifer L. Thorson
*Counsel for Appellee Department of Child Safety*

Law Office of Laurae Kerchenko, PLLC, Phoenix
By Laurae Kerchenko
*Counsel for Appellees Y.L. and M.L.*

Logan Mussman Law, PLLC, Phoenix
By Logan Mussman
*Guardian ad Litem for Appellees Y.L. and M.L.*

---

## MEMORANDUM DECISION

Judge Kent E. Cattani delivered the decision of the Court, in which Presiding Judge Paul J. McMurdie and Judge Samuel A. Thumma joined.

---

**C A T T A N I**, Judge:

**¶1**         Raylien L. ("Mother") appeals the superior court's order terminating her parental rights as to her daughters. For reasons that follow, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

**¶2**         Mother and Brandon L. ("Father") are the biological parents of Y.L. (born in July 2012) and M.L. (born in February 2014).[1]

**¶3**         In August 2021, Mother and Father drove with the children to Father's parents' house, where Father shot and killed his brother and parents. The children were in the backseat when Father declared his intent to kill his relatives, and Y.L. heard six shots and people screaming after Father left the car.[2] Mother drove away with the children after the shooting, instructing them not to tell anyone (especially the police or the government) about what had happened.

**¶4**         Mother was arrested days later and charged with hindering prosecution and witness tampering. She pleaded guilty to hindering prosecution (later amended to tampering with physical evidence) and remained incarcerated until September 2023.

**¶5**         Meanwhile, the Department of Child Safety ("DCS") took Y.L. and M.L. into care, and the superior court found them dependent as to Mother, adopting a case plan of family reunification. After removal, DCS discovered that the children had received minimal medical and no dental

---

[1]         Father's parental rights were also terminated, but he is not a party to this appeal.

[2]         Father was arrested, charged with and convicted of three counts of first degree murder, and sentenced to three consecutive terms of natural life in prison. Father is now subject to lifetime no-contact injunctions that prohibit any contact with Y.L. or M.L.

care, and each needed to have teeth extracted due to decay. The children had never attended school and displayed "extreme academic deficits," and they lacked "almost all social skills." Over time, the children disclosed additional details about their past, including multiple incidents of domestic violence between their parents, physical abuse, and stints of homelessness and hunger.

¶6 The children also faced significant behavioral and emotional challenges. After months of trauma therapy and with the stability of a therapeutic foster home, however, they made significant progress behaviorally, emotionally, and academically.

¶7 Contact between Mother and the children was restricted throughout the dependency. Initially, the criminal court presiding over Mother's prosecution entered a no-contact order prohibiting all contact between Mother and the children. That prohibition remained in place until August 2023 (the month before Mother's release), when the criminal court ceded authority to the juvenile court to determine and implement plans for appropriate contact between Mother and the children as part of the dependency proceeding.

¶8 In the dependency, Mother's statements minimizing and invalidating the children's experiences and her failure to take accountability for her role in the children's trauma—positions that the children's therapist flagged as being severely detrimental to their emotional health—became key barriers to instituting visitation. DCS thus recommended that Mother engage in individual therapy to build self-awareness, take accountability for her actions and how they affected the children, and learn appropriate boundaries for interacting with the children without jeopardizing their well-being.

¶9 Just before her release from prison, Mother requested that the court order DCS to provide supervised visitation, but the court found a more gradual process (individual therapy followed by a slow introduction of therapeutic visitation, with input from the children's therapist to avoid undermining the children's progress) was necessary to avoid endangering the children's health. After her release, Mother began individual therapy. But she reportedly believed therapy to be unnecessary, and she declined to discuss "what happened" on the advice of her criminal attorney. Even by January 2024, when the DCS case manager met jointly with the children's therapist and Mother's therapist to discuss a path toward visitation, Mother still had not disclosed to her therapist the circumstances leading to DCS involvement. After the case manager and the children's therapist explained

the case background to Mother's therapist and described the concerns preventing visitation, Mother promptly fired her therapist.

¶10 By March 2024, Mother had participated in a psychological evaluation, which noted Mother's responses were "very guarded" and appeared to deliberately avoid admitting maladaptive behavior, leaving open questions as to whether she had "a clear notion of what her children [had] experienced or her duty to protect them." The children had also made new disclosures about prior physical abuse, domestic violence, and other neglect, but Mother either denied or refused to discuss those concerns. Mother did, however, regularly send the children gifts, and she began sending them cards as well.

¶11 At Mother's request, the superior court held an evidentiary hearing to consider the issue of visitation. In a May 2024 order, the court denied visitation, finding that visits would seriously endanger the children's mental and emotional health. The court specifically noted that "[p]rofessionals who have assessed them have concluded that the risk they will be retraumatized by contact with Mother is too high at this time, particularly if Mother is not approaching reunification prepared to respect their feelings and perspectives about her behaviors." The court concurrently ordered, however, that DCS "provide Mother with a clear outline of the ways Mother can demonstrate accountability, insight and her ability [to] respect the children's perspectives in order to help lower the risk they will be retraumatized" within two weeks and provide monthly updates on her progress.

¶12 The DCS case manager then emailed the children's therapist seeking input on what Mother would need to do before the therapist would recommend in-person visitation. Expressly noting her opinion that it would be "detrimental to have visits/contact especially now," the children's therapist responded that Mother would need to "[c]onsistently participat[e] in her own therapy to work on her role in [the] children's trauma," not "blam[e] DCS or anyone else about what has happened," and begin with supervised telephonic contact (before in-person visits) to ensure Mother could abide by guidelines for interaction. DCS then sent Mother an outline of behavioral changes required before beginning contact with the children, including articulation of how Mother's actions had contributed to the trauma and how to avoid invalidating the children's experience. DCS also requested that Mother's therapist communicate with DCS monthly (during which DCS could provide information from the children's therapist) and noted that both therapists would be invited to case plan meetings.

¶13 When the DCS case manager and supervisor communicated with Mother's therapist in July, however, the therapist was still unaware of the triple homicide that led to DCS intervention and of the prior domestic violence and medical, dental, and educational neglect the children had experienced. Even by September 2024, Mother's therapist reported to DCS that Mother continued to struggle to understand the children's trauma and did not want to take accountability for the ramifications of the murders because she was not at fault.

¶14 Meanwhile, the superior court changed the case plan to severance and adoption in July 2024, and DCS moved to terminate Mother's parental rights based on neglect and 15 months' out-of-home placement. *See* A.R.S. § 8-533(B)(2), (8)(c). Around the same time, the children stepped down from their therapeutic foster home to placement in a licensed foster home in a different part of the state. Given the move, they began seeing a different therapist. The DCS case manager suggested that Mother's therapist collaborate with the children's new therapist once they established care. And when the children's new therapist expressed uncertainty about meeting with Mother's therapist, DCS organized a consultation with the unit psychologist to explain how collaboration would assist Mother's therapist (and then Mother) in gaining understanding of the children's trauma experiences.

¶15 In September 2024, the children moved for an order permitting visitation with Mother. DCS opposed the motion based on Mother's lack of progress in therapy. DCS records at that time still showed that, although Mother expressed love and affection for the children, she continued to minimize or deny the children's experiences and had not developed insight or taken accountability for the trauma they experienced when in her care.

¶16 With the parties' agreement and given the interrelated issues presented, the superior court considered the children's motion for visitation and DCS's termination motion together, based on evidence presented at three days of hearings in October and November 2024. The court ultimately terminated Mother's parental rights (and denied the children's request for visitation), finding statutory grounds for termination based on neglect and 15 months' out-of-home placement and that termination would be in the children's best interests.

¶17 Mother timely appealed, and we have jurisdiction under A.R.S. § 8-235(A).

## DISCUSSION

**¶18** The superior court may terminate a parent–child relationship if clear and convincing evidence establishes at least one statutory ground for termination and a preponderance of the evidence shows termination to be in the child's best interests. A.R.S. § 8-533(B); *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 22 (2005). On review, we accept the court's factual findings if supported by reasonable evidence, giving due regard to that court's unique ability to weigh the evidence and assess witness credibility. *Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, 478, ¶ 30 (2023); *see also Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 151, ¶ 18 (2018) (reiterating that the appellate court does not reweigh even "sharply disputed" evidence (citation omitted)). We uphold the court's legal conclusions unless clearly erroneous. *Brionna J.*, 255 Ariz. at 478–79, ¶ 31.

## I.     Statutory Grounds.

**¶19** Mother argues that, by failing to institute visitation with the children, DCS failed to meet its obligation to make a diligent effort to provide appropriate reunification services. She thus asserts that the superior court erred by finding grounds for termination based on 15 months' out-of-home placement.

**¶20** Among other elements, termination on an out-of-home-placement statutory ground requires proof that "[DCS] has made a diligent effort to provide appropriate reunification services." A.R.S. § 8-533(B)(8). To fulfill this obligation, DCS must provide services with a "reasonable prospect of success" to afford the parent the time and opportunity to become, if possible, a safe and effective parent. *See Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶¶ 34, 37 (App. 1999); *Maricopa Cnty. Juv. Action No. JS–501904*, 180 Ariz. 348, 353 (App. 1994). Visitation between parent and child "is perhaps the most basic and essential of these services" and should be denied "only under extraordinary circumstances." *Michael M. v. Arizona Dep't of Econ. Sec.*, 202 Ariz. 198, 200, ¶ 9 (App. 2002); *Maricopa Cnty. Juv. Action No. JD-5312*, 178 Ariz. 372, 375 (App. 1994). Nevertheless, the superior court retains discretion to restrict visitation if visits would seriously endanger or adversely affect the child. *Michael M.*, 202 Ariz. at 201, ¶ 11; *JD-5312*, 178 Ariz. at 376.

**¶21** Here, Mother argues that both her therapist and the children's therapist recommended beginning visitation several months before the termination trial, but DCS blocked the process. Although Mother asserts that the children's therapist had recommended starting telephonic visits in

May 2024, the email on which she relies in fact reflects the children's therapist's opinion that visits (or any contact) would be "detrimental" at that time. Based on recommendations from the children's therapist, DCS outlined actions or adjustments that Mother would need to take (e.g., engaging in individual therapy to gain insight into the children's trauma and accepting accountability for her role) *before* visitation could begin, but Mother did not comply.

**¶22** Mother correctly notes that the children made significant progress in therapy. Still, the children's therapist continued to express concern that contact with Mother would risk unwinding that progress and retraumatizing them, given Mother's continued minimization and invalidation of the children's experiences. Mother relies on her therapist's positive statements about the progress she was making. But other evidence suggested that Mother was not forthcoming with her therapist and that she continued to avoid accepting accountability even into fall 2024. And although Mother asserts that DCS blocked necessary communication between Mother's and the children's therapists, the record shows that the case managers coordinated direct contact early on, offered regular communication at case plan meetings, and recommended and attempted to facilitate contact with the children's new therapist. At the core, Mother's challenge is directed to how the superior court weighed the evidence, an assessment we will not disturb on appeal. *See Alma S.*, 245 Ariz. at 151, ¶ 18.

**¶23** Mother does not challenge the superior court's findings as to the other elements of the 15-months' out-of-home placement ground, and the record supports them. *See* A.R.S. § 8-533(B)(8)(c) (in addition to services, requiring proof of 15 months' time in care, parent's inability to remedy the circumstances necessitating out-of-home placement, and "a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future"). And because we affirm on this basis, we need not address the alternative statutory ground of neglect. *See Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 3 (App. 2002).

## II.    Best Interests.

**¶24** The superior court may find termination to be in a child's best interests if the child would benefit from severance or be harmed by a denial of severance. *Alma S.*, 245 Ariz. at 150, ¶ 13. The court considers the totality of the circumstances, including prospects for adoption, whether the placement is meeting the child's needs, and the parent's rehabilitative

efforts. *Id.* at 148, 150–51, ¶¶ 1, 13; *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 3–4, ¶ 12 (2016). The child's stability and security are primary considerations. *Demetrius L.*, 239 Ariz. at 4, ¶ 15.

**¶25** The superior court here considered Mother's bond with the children as well as the children's love for and desire to maintain contact with her. The court nevertheless concluded that maintaining the relationship would be detrimental given the degree of neglect the children suffered in Mother's care and her unwillingness to recognize it. The court further found that the children were adoptable (and adoption probable) even though no adoptive plan was yet in place, and that the current placement was meeting the children's needs and was willing to keep them until they found a permanent placement.

**¶26** Mother specifically challenges the court's finding of adoptability, asserting that the children (who are at or near the age at which their consent is required) oppose adoption and wish to reunify. In Mother's view, termination of her parental rights gives no benefit (and denial no detriment) since the children's opposition to adoption means they would remain parentless. But while Mother relies on avowals of the children's attorney and guardian ad litem to suggest the children oppose adoption, the case worker and the children's therapist testified that the children had mentioned wanting to be adopted (and never had expressed to the contrary that they opposed adoption). To the extent this reflects a factual dispute, the superior court's ruling is well-grounded in the record, and we do not reweigh the evidence on appeal. *See Alma S.*, 245 Ariz. at 151, ¶ 18.

## CONCLUSION

**¶27** We affirm.



MATTHEW J. MARTIN • Clerk of the Court
**FILED**: JR